[L. A. No. 24232.   In Bank.   Jan. 30, 1957.]

AUTOMOTRIZ DEL GOLFO DE CALIFORNIA S. A. de C. V., Respondent, v. ERWIN G. RESNICK et al., Appellants.

Levy, Bernard & Jaffe and George W. Rochester for Appellants.

C. P. Von Herzen and Samuel L. Laidig as Amici Curiae on behalf of Appellants.

Francis B. Cobb for Respondent.

GIBSON, C. J.—Plaintiff, a Mexican corporation, brought this action for the balance due on the price of eight automobiles which it alleges were sold to defendants E. G. Resnick, W. D. Cowan and R. W. Cowan. The trial court found for plaintiff, and defendants have appealed from the judgment.

Defendants contend first that plaintiff cannot maintain this action because, they assert, the transaction was intrastate and plaintiff did not allege or prove that it had qualified to do business in California by complying with chapter 3 of the Corporations Code. Section 6801 of the Corporations Code provides in part: "A foreign corporation subject to the provisions of Chapter 3 of this part which transacts intrastate business in this State without complying therewith shall not maintain any action or proceeding upon any intrastate business so transacted in any court of this State, commenced prior to compliance with Chapter 3 until it has complied with the provisions thereof, . . ."

■ The burden of proving that section 6801 precludes maintenance of an action is upon the party pleading the bar of the statute. (*W. W. Kimball Co.* v. *Read,* 43 Cal.App. 342, 346 [185 P. 192]; see *McMillan Process Co.* v. *Brown,* 33 Cal.App.2d 279, 284 [91 P.2d 613]; *Indian Refining Co., Inc.* v. *Royal Oil Co., Inc.,* 102 Cal.App. 710, 716 [283 P. 856].)

■ Defendants, in order to prove that the statute applies, were required to show that the particular transaction involved here was an intrastate sale. ■ There is evidence that, prior to the sale of the eight automobiles, several similar transactions had been arranged by telephone between plaintiff in Mexico and Resnick in Los Angeles. After agreement on the price, the cars would be sent to Los Angeles, and the buyer would pay the cost of transporting them from Mexico. Sales made in that manner were not intrastate transactions. Plaintiff sometimes shipped cars to the "L. A. automobile auction," and, on occasion, if they were not sold there, its agent would offer them to Resnick, usually negotiating by telephone from Mexico. The only evidence as to how the

transaction for the sale of the eight cars was handled was the testimony of plaintiff's sales representative that "it could be possible" that they were "picked up" at the "L. A. automobile auction." In this state of the record the trial court was clearly justified in concluding that defendants had failed to meet the burden of proving that the sale involved here was an intrastate transaction.

Defendants next contend that the evidence is insufficient to support the trial court's finding that they were doing business as individuals. We do not agree.

In September of 1952 Resnick and several other persons formed Erbel, Inc., a California corporation. After obtaining releases from his associates of their interest in the corporation, Resnick arranged with W. D. Cowan and his son, R. W. Cowan, to establish a car company. It was orally agreed that Resnick, who was to manage the business, was to receive 50 per cent of the "profits" and that each of the Cowans was to receive 25 per cent, and the three of them became officers and directors of Erbel, Inc. The corporation never issued stock or applied for a permit to issue stock, and, although defendants testified that they contributed $5,000 to the capital of Erbel, Inc., the court did not find that this was true, and such a finding was not compelled by the record. There is no evidence that any bank account was ever maintained in the name of Erbel, Inc., but a checking account was opened by defendants with the Bank of America under the name "Erbel, Inc. dba Bi-Rite Auto Sales."

The volume of sales from the automobile business conducted by defendants ran between $100,000 and $150,000 a month. The method used to finance the purchase of cars which were to be offered for sale was complex, but it is clear that the funds required for this purpose were supplied by the Cowans and not by the corporation. According to defendants, they bought cars for resale with money furnished by the Cowans, and title was held by the Cowans until a purchaser for a car was found. The proceeds of resale were apparently deposited in the Bank of America account, and checks were drawn on that account by Resnick to reimburse the Cowans for the money advanced. In this connection, the trial court found that the Cowans made advances in the amount of $223,445 which were used by defendants to operate the business and which were repaid in part from time to time.

Erbel, Inc. filed a voluntary petition in bankruptcy, listing liabilities of $146,247.43 and assets which were subsequently

liquidated by the trustee in bankruptcy for approximately $16,000. The record shows that about a month and a half before initiation of the bankruptcy proceedings, when it was apparent that the business was in financial difficulties, the Cowans transferred to Erbel, Inc. the automobile titles which they were then holding.

Prior to entering into any transactions with defendants, plaintiff informed Resnick that it would not accept his check or draft, and it agreed to deal with him only after it was assured that W. D. Cowan was "going into business" and would be "backing the business up." In previous transactions plaintiff had been given checks drawn on the Bank of America account, and the present action is based upon two checks which were drawn by Resnick on that account and later dishonored by the bank.

■ It is the general rule that the conditions under which a corporate entity may be disregarded vary according to the circumstances in each case. (See *H. A. S. Loan Service, Inc.* v. *McColgan*, 21 Cal.2d 518, 523 [138 P.2d 391, 145 A.L.R. 349]; *Stark* v. *Coker*, 20 Cal.2d 839, 846 [129 P.2d 390].) ■ It has been stated that the two requirements for application of this doctrine are (1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow. (*Stark* v. *Coker*, 20 Cal.2d 839, 846 [129 P.2d 390]; *Watson* v. *Commonwealth Ins. Co.*, 8 Cal.2d 61, 68 [63 P.2d 295].)

■ The failure to issue stock or to apply at any time for a permit, although not conclusive evidence, is an indication that defendants were doing business as individuals. (*Geisenhoff* v. *Mabrey*, 58 Cal.App.2d 481 [137 P.2d 36]; see *Marr* v. *Postal Union Life Ins. Co.*, 40 Cal.App.2d 673 [105 P.2d 649].) In the Marr case the court stated: "While the fact standing alone that a corporation remains inchoate without stockholders or stock is not of itself determinative of an *alter ego* relationship upon its part, nevertheless it does indicate that such corporation may exist merely to serve the interests of another —a corporation or an individual." (40 Cal.App.2d at p. 682.)

■ Another factor to be considered in determining whether individuals dealing through a corporation should be held personally responsible for the corporate obligations is whether there was an attempt to provide adequate capitaliza-

tion for the corporation. In Ballantine on Corporations (rev. ed., 1946), at pages 302-303, it is stated: "If a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, it is inequitable that shareholders should set up such a flimsy organization to escape personal liability. The attempt to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity and will be ineffectual to exempt the shareholders from corporate debts. It is coming to be recognized as the policy of the law that shareholders should in good faith put at the risk of the business unincumbered capital reasonably adequate for its prospective liabilities. If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege."

The rule that inadequate capitalization may be considered as a factor in determining whether the corporate entity should be disregarded was followed in *Shea* v. *Leonis,* 14 Cal.2d 666 [96 P.2d 332], where a lessee attempted to escape liability for rent due under a lease by assigning his interest in the lease to a corporation which was without other assets. The court held that the owners of the corporate stock were liable for the rental payments, pointing out that it is proper to disregard corporate existence "where, as in the instant case, the device adopted is . . . an attempt to avoid liability for benefits enjoyed by means of taking the obligation in the name of a specially organized corporation which has no assets." In *Carlesimo* v. *Schwebel,* 87 Cal.App.2d 482 [197 P.2d 167], it was recognized that "the proper rule is that inadequate financing, where such appears, is a factor, and an important factor, in determining whether to remove the insulation to stockholders normally created by the corporate method of operation." (See also *Mosher* v. *Salt River Valley Water Users' Assn.,* 39 Ariz. 567 [8 P.2d 1077] ; Ballantine, *Corporations*: *"Disregarding the Corporate Entity" as a Regulatory Process* (1943) 31 Cal.L.Rev. 426, 427; Fuller, *The Incorporated Individual*: *A Study of the One-Man Company* (1938) 51 Harv.L.Rev. 1373, 1381-1383; *cf. Dixie Coal Min. & Mfg. Co.* v. *Williams,* 221 Ala. 331 [128 So. 799].) Although defendants testified that the sum of $5,000 became a part of the capital of the corporation, the trial court, as we have seen, was not compelled to accept that testimony as being true. Moreover, even if the court believed defend-

ants' testimony in this regard, it could have inferred that $5,000 was an insufficient capital investment in view of the volume of business conducted.

In determining whether defendants should be allowed to escape personal liability for the debts due plaintiff, the trial court was entitled to consider the failure to issue any stock or apply for permission to do so and the creation and operation of Erbel, Inc., with little or no capital, as well as all relevant facts concerning the manner in which the business was operated.

There is ample support in the record for the finding of the trial court that defendants were doing business as individuals.

The judgment is affirmed.

Shenk, J., Traynor, J., Schauer, J., Spence, J., and Mc-Comb, J., concurred.

CARTER, J.—I dissent.

As I read the majority opinion, it holds that the corporate entity may be disregarded where the corporation has not issued any stock and is undercapitalized.

As to the first point, it is difficult to see how there can be a liability imposed upon the stockholders for an obligation of the corporation when there are no stockholders to hold liable. The theory of piercing the corporate veil is based on the concept that the shareholders of the corporation are liable although the obligation was ostensibly incurred by the corporation because on one basis or another the shareholders and corporation will not be distinguished; the separation of the corporate entity from its stockholders will not be observed. This is to be distinguished from the case such as may exist here where the individuals interested in the corporation are, rather than the corporation, the ones who incurred the obligation or the obligation was incurred by both. In the instant case it is true that no stock was issued nor was a permit for issuance obtained from the Corporation Commissioner, yet the evidence is undisputed that it was agreed that defendant Resnick would own half the corporation and the Cowans the other half and the business was just getting started. With such facts present it is difficult to see why the mere failure to issue stock could be a factor in determining whether the corporate entity should be disregarded. In *Geisenhoff* v. *Mabrey,* 58 Cal.App.2d 481 [137 P.2d 36], relied upon by the majority, the trial court had found that the persons who

formed the corporation were doing business as joint venturers and as such incurred the obligation in the name of the corporation. That case seems to hold that individual liability may not be escaped by the formation of a corporation unless and until stock is issued. No authority is cited for that proposition and I find none which supports it. It would indeed be a novel theory in corporation law. As said on the subject by the District Court of Appeal in this case: ''While the Corporations Code authorizes corporate directors to organize by the election of officers, yet, they may in the name of and in behalf of the corporation apply for a permit to issue its shares. Corporation Code, sections 25154, 25153. However, these sections do not prohibit the transaction of corporate business or the performance of any act by the corporation other than the issue or sale of securities. Prior to the enactment of the last cited sections, the courts had held that a partnership is not necessarily the result of an abortive attempt to organize a corporation or of a mere failure to issue corporate shares. *Blanchard* v. *Kaull,* 44 Cal. 440, 451; *I. W. Williams Co.* v. *Leong Sue Ah Quin,* 44 Cal.App. 296, 298 [186 P. 401]. The idea that the organizers of a corporation would be penalized in any way for the transaction of corporate business prior to the issuance of its stock does not appear to have occurred to the authors of section 25154. The only penalties to accrue against directors with reference to the issuance of shares are those which result from the enforcement of the statutes for violations of the Corporate Securities Act. Corporation Code, section 25000 et seq. It makes felonious many acts of corporate officers in attempting to issue their company's securities without first having obtained a permit so to do. But nowhere is it there suggested that a corporation is emasculated by virtue of its failure to procure a permit to issue its shares. Nor is there any authority for holding that the failure of directors to obtain a permit makes of them a copartnership or a joint adventure except the Geisenhoff decision, *supra,* which imposed a sanction without legislative authorization. On the contrary, the point was before this court in *Vogel* v. *Bankers Bldg. Corp.,* 112 Cal.App.2d 160, 168 [245 P.2d 1069]. It was there held in effect that non-issuance of stock does not as a matter of law fasten upon promoters the status of joint adventurers; that the creation of that relationship depends upon the intent of the parties.'' (*Automotriz del Golfo de California* v. *Resnick* (Cal.App.), 297 P.2d 109, 114.)

The other factor relied upon by the majority is no more

persuasive either alone or in conjunction with the first factor. It is said that undercapitalization of a corporation is an indication that the corporate entity should be disregarded. Precisely what is meant by undercapitalization is not explained. The mere structure of the capital stock is not important. For the idea to be meaningful it must refer to the assets of the corporation—its financial standing. But the majority opinion mentions the "capital stock" authorization of $5,000 and compares that with a business of $100,000 to $150,000 per month. However, as stated in the majority opinion, the Cowans were advancing money to operate the business and as far as appears that was advanced to the corporation as its asset. The monthly business was gross sales and thus there was sufficient income to handle the business; that monthly income did not result in an expense or incurrence of obligations by the corporation. In fact, there is no evidence which reflects the financial status of the corporation other than its authorized capital stock which is no criterion of its financial health. Hence it follows that it was not shown that the assets were so inadequate that the corporate entity must be disregarded even if we assume that its financial worth is a factor in determining whether the entity is to be disregarded. Moreover, that assumption is of very doubtful validity because otherwise only well financed corporations may maintain their entity. In fact it may be said that every corporation which fails because it is unable to pay its obligations is underfinanced, but certainly that should not be a test of whether the entity should be disregarded. In a rapidly changing economy what might seem to be adequate financing today would be inadequate tomorrow, and it should be obvious that risky business ventures could not be undertaken by use of the corporate device without subjecting the participants to personal liability. I know of no such rule. What may appear hazardous by hindsight may not seem so at the outset. If the corporate entity may be disregarded in a case such as this it will not be safe for anyone to use the corporate device for the promotion of a business enterprise even though he acts in the utmost good faith and pursues a course of unquestionable fair dealing.

In my opinion there is no factual basis here to justify piercing the corporate veil and disregarding the corporate entity. To justify such holding it should be made to appear that the corporate entity was employed as a mere shield for the purpose of evading obligations incurred for the benefit of

those who created the corporate entity. No such showing is made here.

For the foregoing reasons, I would reverse the judgment.

Appellants' petition for a rehearing was denied February 27, 1957. Carter, J., was of the opinion that the petition should be granted.