UNITED STATES of America,
Plaintiff-Appellee,

v.

STANDARD BEAUTY SUPPLY STORES, INC., Standard Beauty Supplies of California, Inc., American Beauty Supply Stores, Inc., California Corporations, and Hal Linden, an Individual, Defendants-Appellants.

No. 75–2258.

United States Court of Appeals,
Ninth Circuit.

Sept. 22, 1977.

Jerry L. Kay, Los Angeles, Cal. (argued), for defendants-appellants.

J. Mark Waxman, Asst. U. S. Atty., Los Angeles, Cal. (argued), for plaintiff-appellee.

Before ELY and SNEED, Circuit Judges, and CALLISTER,* District Judge.

SNEED, Circuit Judge:

Defendant Hal Linden appeals from the district court's holding that Linden is per-

---

* Honorable Marion J. Callister, United States District Judge for the District of Idaho, sitting by designation.

sonally liable for a default judgment against defendant Standard Beauty Supply Stores, Inc.[1] The lower court held Linden liable for the judgment after finding that Standard Beauty was the *alter ego* of Linden. We remand for further consideration of the *alter ego* question. The district court's holding was founded on an incorrect interpretation of California law. Specifically, the lower court mistakenly assumed that Standard Beauty's failure to pay its California franchise taxes constituted *prima facie* evidence that Standard Beauty's corporate veil should be pierced. The lower court therefore shifted the burden on Linden to prove that Standard Beauty was not his *alter ego,* when the burden of proof should have been on the United States.

## I.

### FACTS.

This suit stems from a commercial loan of $115,000 made in June of 1970 to O'Henri's Inc., a Los Angeles supplier of ethnic beauty and health aids. The loan was guaranteed by the United States Small Business Administration and was secured by a lien on the assets of O'Henri's. Faced by severe financial problems only six months later, O'Henri's sold its assets to Standard Beauty subject to any then-existing indebtedness.

The purchase of the O'Henri's assets was negotiated by appellant Linden, president and sole shareholder of Standard Beauty. Linden had purchased the shares of Standard Beauty from Universal Acceptance Corporation in December of 1970 for $10,000. At the time of the purchase of O'Henri's assets, Standard Beauty was delinquent on its California franchise taxes. The delinquency dated to the period before Linden purchased Standard Beauty. Under California Law, this suspended Standard Beauty's "corporate powers, rights and privileges." Cal.Rev. & Tax Code § 23301 (West 1970). Any contract made by Standard Beauty during this period of suspension was voidable at the instance of any other party to the contract. *Id.* § 23304. According to Linden, however, he was not aware of Standard Beauty's failure to pay its California franchise taxes either at the time of his purchase of Standard Beauty or at the time of Standard Beauty's purchase of the O'Henri's assets. In April of 1971, less than half a year after Linden's acquisition of its shares, Standard Beauty transferred its assets to American Beauty Supply Stores, Inc., another corporation solely owned by Linden.

The O'Henri's assets were transferred upon their sale to Standard Beauty to a warehouse owned by Standard Drug Supply, Inc., a third corporation solely owned by appellant Linden. Standard Beauty, American Beauty, and Standard Drug all utilized the warehouse at one time or another. Linden testified that the O'Henri's assets were segregated from the other goods in the warehouse. Upon the transfer of Standard Beauty's assets to American Beauty, the O'Henri's assets remained in the Standard Drug warehouse.

According to Linden, the Small Business Administration was notified of the location of the O'Henri's assets. There is also evidence in the record that Standard Beauty attempted to purchase the O'Henri's assets from the Small Business Administration. In September of 1971, however, City National Bank foreclosed on a loan to Standard Drug. The contents of the Standard Drug warehouse, including the assets of O'Henri's, were thereupon sold in a foreclosure sale to a third party.

The Small Business Administration brought suit against Linden and his three corporations on the alternative theories that the defendants converted the assets of O'Henri's and/or fraudulently conspired to prevent the collection of the indebtedness due under the note. Default judgments were entered against Standard Beauty and Standard Drugs upon their failure to answer the United States' complaint. At the beginning of the trial on the liability of defendant Linden, the United States

---

1. While both Linden and defendant American Beauty Supply Stores, Inc. submitted formal notices of appeal, only Linden submitted briefs and argued for reversal before this court.

presented evidence that Standard Beauty had not paid its corporate franchise taxes and that its corporate powers were therefore suspended at all times relevant to the suit. The trial court ruled that this established a prima facie case that Standard Beauty was the *alter ego* of Linden and that the burden of proof was on Linden to rebut the presumption. Linden presented five witnesses in an attempt to overcome the *prima facie* case. The United States presented no "rebuttal" witnesses. At the close of Linden's presentation, the trial court ruled that Linden was liable for the default judgment against Standard Beauty.[2] According to the trial court, if a corporation fails to pay its California franchise tax, the corporation's shareholders

> "no longer have the benefit of limited liability . . . .. It is against the law, it is a crime, to function as a corporation without the payment of the Franchise Tax. By virtue of that statute, Mr. Linden was deprived of limited liability.

> "Now, I took evidence in this case . . . to determine whether or not there were overriding equities which would cause me to say that 'Mr. Linden, you were tricked, you were betrayed, you were an innocent bystander and therefore I am not going to pierce this corporate veil as required by the California statute.'

> "For example, if this action were brought by the Government against [two directors of Standard Beauty who were not shareholders], the Court would have no hesitancy at all in stating that by mere virtue of the fact that they were . . . . officers, directors, and employees, that . . . they could not be charged with the liability of the corporation. But Mr. Linden was the sole shareholder, he used the corporation, he attempted to use the corporation for his own benefit and everything that he did in these transactions was for his own bene-

fit and he did not pay his dues. He did not pay his dues . . . .."

Reporter's Transcript, at 145.

## II.

## ANALYSIS.

### A. The Scope of Section 23301.

■ The trial court assumed that section 23301 of the California Revenue and Tax Code, suspending a corporation's "powers, rights and privileges" for failure to pay its franchise taxes, also operates to pierce the corporate veil absent overriding equities. However, there is no evidence that the California legislature intended section 23301 to deprive the corporation's shareholders of the normal protection of limited liability. In enacting section 23301, the California legislature was only interested in putting additional bite into the collection of franchise taxes. *Peacock Hill Ass'n v. Peacock Lagoon Construction Co.*, 8 Cal.3d 369, 370, 105 Cal.Rptr. 29, 503 P.2d 285, 286, (1972); *Boyle v. Lakeview Creamery Co.*, 9 Cal.2d 16, 19, 68 P.2d 968, 969 (1937). The added bite was to be provided by suspending delinquent corporations' powers, rights and privileges; it was expected that, upon suspension, normal corporate operations would temporarily cease. To back up the suspension, the California legislature also provided that any contract made in violation of section 23301 was voidable at the instance of other parties to the contract, *see* Cal.Rev. & Tax Code § 23304 (West 1970), and that any person purporting to exercise the corporate powers, rights and privileges would be subject to criminal penalties and fines, *see id.* § 25962.1. These sections were felt adequate to meet the perceived revenue collecting needs. California could have also provided that the shareholders would be liable for any debts incurred during the period of suspension.[3] *Compare* Mich.Comp.Laws

---

2. American Beauty's answer was stricken and American Beauty found liable upon proof that American Beauty's corporate powers had also been suspended for failure to pay its franchise tax.

3. That the California legislature did not intend to take every measure to enforce the franchise tax is reflected in the fact that Cal.Rev. & Tax Code § 23304 (West 1970) does not automatically void all contracts entered during the peri-

Ann. § 450.87 (providing that officers and directors of a corporation are liable for all debts incurred during the period of suspension). California, however, did not so provide.

It should be emphasized that, while section 23301 suspends the corporation's powers, the corporation continues to exist.[4] Actions that would have been considered those of the corporation before the suspension should ordinarily continue to be viewed as actions of the corporations. If the corporation acts, it is the corporation, not its agents, officers, or shareholders, who should be held privately responsible for such actions. *See Bank of America NT&SA v. Morse,* 265 Or. 72, 508 P.2d 194, 196–98 (1973).

Of course, a corporation's failure to pay its franchise tax may be evidence that the shareholders do not view the corporation as having a separate existence and that the corporation should possibly be regarded as the *alter ego* of its shareholders. But absent any indication that the California legislature intended section 23301 either to modify or end the shareholders' normal protection of limited liability, this failure must be treated and weighed like any other failure to observe the normal requirements for a corporation.

B. Elements of the *Alter Ego* Doctrine.

■ Issues of *alter ego* do not lend themselves to strict rules and *prima facie* cases. Whether the corporate veil should be pierced depends on the innumerable individual equities of each case. "Only general rules may be laid down for guidance." *Stark v. Coker,* 20 Cal.2d 839, 846, 129 P.2d 390, 392 (1942). Similar to Standard Beau-

ty's failure in the instant case to pay its franchise tax, if not more extreme was the failure of the corporation in *Automotriz Del Golfo De California S.A. v. Resnick,* 47 Cal.2d 792, 306 P.2d 1 (1957) to issue shares of stock. In both cases, normal corporate requirements were ignored. However, in *Resnick* there was no discussion of *prima facie* cases; the failure to issue shares was merely "an indication that defendants were doing business as individuals." *Id.* at 796, 306 P.2d at 4. "[T]he fact standing alone that a corporation remains inchoate without stockholders or stock is not of itself determinative of an *alter ego* relationship." *Marr v. Postal Union Life Insurance Co.,* 40 Cal.App.2d 673, 682, 105 P.2d 649, 654 (1940).

■ Before a court can hold that a corporation is the mere *alter ego* of its shareholders, two particular findings must be made. First, the court must determine that there is "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist." *Watson v. Commonwealth Insurance Co.,* 8 Cal.2d 61, 68, 63 P.2d 295, 298 (1936). Second, however, it must be shown that the failure to disregard the corporation would result in fraud or injustice. *Id.* Failure to pay corporate franchise tax may, as indicated above, be relevant to the first of the two necessary determinations. But it is of doubtful, if any, relevance to the latter. This is a crucial point. "The purpose of the [*alter ego*] doctrine is not to protect every unsatisfied creditor, but rather to afford him protection, *where some conduct amounting to bad faith* makes it inequitable . . . for the equitable owner of a corporation to hide behind its corporate veil."[5] *Arnold v. Browne,* 27 Cal.App.3d 386, 397,

---

od of suspension but merely makes them voidable at the instance of the party.

**4.** The continued existence of the corporation is reflected in Cal.Rev. & Tax Code § 23303 which provides that, notwithstanding § 23301, any corporation which transacts business while suspended is subject to the franchise tax for that period.

**5.** *See also Plumbers & Fitters, Local 761 v. Matt J. Zaich Const. Co.,* 418 F.2d 1054, 1058

(9th Cir. 1969): "In principle . . . the disregarding of the corporate form of business should not rest on the manner of doing business in general but should rest on the effect that the manner of doing business has on the particular transaction involved. . . . Generally speaking, the doctrine is designed to prevent a person from doing injury and then escaping responsibility by hiding behind a corporate shield."

103 Cal.Rptr. 775, 783 (1972). Standard Beauty's franchise tax delinquency clearly fails to establish that the O'Henri's assets were acquired in bad faith.

*Silvey v. Fink,* 99 Cal.App. 528, 279 P. 202 (1929), cited by the United States in support of the district court's holding, is inapposite. In *Silvey,* directors of a newly formed corporation issued stock to plaintiffs. At the time of the issuance, however, the corporation had been suspended for failure to pay its franchise tax. Plaintiffs sued the corporation's directors to recover money advanced as part of the stock subscription. The irrelevance of *Silvey* to the facts before us is discussed in *Bank of America NT&SA, supra,* at 196–97. The applicable California statute at the time of *Silvey* provided for the complete forfeiture of corporate powers upon a failure to pay the requisite franchise tax and further declared any contracts entered into after the forfeiture to be totally void. Thus, the corporation in *Silvey* had ceased to exist at the time of the stock subscription. The subscription was void and the court was able to grant relief on the ground that there had been a total failure of consideration for the money paid by plaintiffs.

■ While other evidence in the record supports the trial court's ultimate finding of *alter ego,*[6] a remand is called for. The evidence at trial, viewed in total, does not require as a matter of law that the factfinder hold Standard Beauty to be the *alter ego* of Linden. And it is impossible to tell how the district court would have ruled on the question if he had not mistakenly assumed that Standard Beauty's franchise tax delinquency constituted a *prima facie* case of *alter ego.* Much of the evidence produced at trial does not support the trial court's conclusion. There was apparently no com-

mingling of personal and corporate funds. The Board of Directors met regularly and prior to major corporate actions, such as the purchase of the O'Henri's assets. Both books and records were carefully kept. An office was maintained. Many of the elements usually present in an *alter ego* case were absent here. *See generally Arnold v. Browne, supra,* 27 Cal.App.3d at 394–95, 103 Cal.Rptr. at 781–82; Schifferman, *The Alter Ego Doctrine in California,* in Advising California Business Enterprises, at 785, 791–92 & 793–94 (1958).

We therefore remand to the district court for a full evidentiary hearing and new holdings on the question of whether Standard Beauty is the *alter ego* of appellant Linden.[7]

REVERSED and REMANDED.

ELY, Circuit Judge (dissenting):

I respectfully dissent. While I thoroughly agree with the majority's discussion in respect to the law which is to be applied in determining whether or not an *alter ego* relationship has been established, I have concluded that the majority overemphasizes a remark, obviously impromptu, made by the district judge in the course of the proceedings in his court. The judge did indeed make the statement that because Standard Beauty had failed to pay its California franchise tax, "Mr. Linden was deprived of limited liability." My Brothers are correct, without doubt, in concluding that the specified statement of the trial judge was overbroad and incorrect. Viewing the record as a whole, however, it is quite clear that the district judge did not literally apply the specified statement. Had he in fact believed that Linden had forfeited all his rights of limited liability by reason of the corporation's failure to pay California's

---

6. For example, Standard Beauty was essentially liquidated only six months after its purchase by Linden and never paid federal income tax for the year in issue. It should be noted that this evidence goes to the issue of corporate identity and not to the issue of inequity. As noted earlier, both a lack of corporate separateness and inequity must be found before the corporate veil can be pierced.

7. Linden also argued on appeal that even if the trial court was correct in piercing the corporate veil the trial court should have afforded him a full hearing on the merits of the Government's case against Standard Beauty. Having decided that a remand is necessary on the *alter ego* issue, we need not reach this record attack.

franchise tax, then there would have been no need for the trial judge to receive evidence, as he did, concerning the whole nature of the corporation's relationship with Linden and to explore, in depth, the opposing equitable considerations. I therefore believe that, despite the erroneous impromptu statement made by the district judge, the record, considered as a whole, belies the fact that the statement was given the application attributed to it by my Brothers. My overview of the record convinces me that the district judge received and considered all pertinent evidence that was tendered in respect to the *alter ego* question. This being true, and since, as my Brothers admit, there was substantial evidence, apart from Standard Beauty's failure to pay the franchise tax, to support the critical determination of the district judge, I would affirm.