The 1992 REPUBLICAN SENATE–
HOUSE DINNER COMMITTEE,
Plaintiff,

v.

CAROLINA'S PRIDE SEAFOOD,
INC., et al., Defendants.

Civ. A. No. 92–1141.

United States District Court,
District of Columbia.

July 28, 1994.

Jan Witold Baran, Wiley, Rein & Fielding, Washington, DC, for plaintiff.

David D. Frieshtat, Shulman, Rogers, Gandal, Pordy & Ecker, P.A., Rockville, MD, Bank of Trade, B. Michael Rauh, Manatt, Phelps, Philips & Kantor, Washington, DC, for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

Before the Court are plaintiff's motion for summary judgment, and defendants Soon Kojima, Bank of Trade, and Topanga Plaza Limited Partnership's motions for summary judgment. Each of these motions seeks to establish a claim on the interpleader funds currently held in the Registry of the Court.[1] For the reasons cited herein, the Court denies plaintiff's motion for summary judgment and grants in part the motions of Bank of

1. Defendants do not seek at this juncture a decision as to the priority of their claims against each other.

Trade, Soon Kojima, and Topanga Plaza Limited Partnership.

## I. *Background*

This action arises from the complaint in interpleader filed by plaintiff, The 1992 Republican Senate–House Dinner Committee ("1992 Committee"), claiming ownership of $500,000 in political contributions received by plaintiff from Michael Kojima and International Marketing Bureau, Ltd. ("IMB").[2] Defendants are various purported judgment creditors of Kojima who allege superior rights to the monies in question.

The 1992 Committee is an unincorporated association registered with the Federal Election Commission ("FEC") and established to solicit and collect political contributions for the 1992 election campaign. During 1992, plaintiff solicited money nationally, including in California where the interpleader funds originated. The 1992 Committee conducts no ongoing business at this time and continues in existence solely to adjudicate matters such as this action.

During the campaign, Michael Kojima was approached repeatedly by the 1992 Committee between March and May 1992. Part of plaintiff's solicitation strategy involved holding fundraising dinners at which large donors were seated in close proximity to major Republican officeholders. The then Republican president and vice president were scheduled to attend one such dinner on April 28, 1992.

In March 1992, the 1992 Committee received two $200,000 checks drawn on the bank account of IMB, a corporation of which Michael Kojima is president and one of three officers. As a result of these donations, Mr. Kojima was listed on the dinner invitations as a sponsor of the April 28th presidential dinner. *See* Bank of Trade, Ex. 11, p. 9.

Also as a result of these donations, Michael Kojima was notified by facsimile on April 20, 1992, that he would be seated at the Vice President's table and would be able to bring 23 guests who would sit at three private tables. Bank of Trade, Ex. 5. The 1992 Committee facsimile listed the donations of each contributor at the main tables and indicated that Michael Kojima was the highest contributor who would not be seated at the President's table.[3]

The flurry of notices to contributors like Michael Kojima exhorted them to increase donations. Kojima, apparently taking the notices to heart, contributed another $100,000 to the 1992 Committee via a personal check dated April 22, 1992.[4] Michael Kojima then qualified to sit at the President's table. It is undisputed that the monetary value of the dinner was nominal in comparison to the contribution. Attendees received no other monetary consideration for their contributions.

Prior to the dinner there appeared to be some, but not much, concern within the 1992 Committee as to the source of Kojima's funds.[5] The director of the Dinner Committee telephoned Kojima and relayed these concerns and questioned what his occupation was. Although it appeared from California records that Kojima's only business was as a restaurateur, the 1992 Committee accepted without certification Kojima's statements that he was involved in international marketing and the organizing of telecommunications consortiums. Bank of Trade Ex. 12.

More damaging information came to light in May 1992 when a *Los Angeles Times* article noted that Kojima was the biggest contributor at the April 28th dinner. *See* Bank of Trade, Ex. 9. The article continued:

---

**2.** Michael Kojima is president of IMB, a California corporation.

**3.** An earlier notice dated April 10, 1992, indicated that Mr. Kojima would be seated at the President's table. *Id.* By comparing the two lists, it is obvious that Kojima was dropped from the President's table when another donor contributed $402,250.

**4.** Although the final check was drawn on Kojima's personal account, records filed by the 1992 Committee with the FEC indicate that all three checks were treated by plaintiff as corporate political contributions by IMB. *See* Bank of Trade Exs. 2, 8.

**5.** Specifically, a journalist telephoned the 1992 Committee and queried "[h]ow do you know whether [Kojima's] checks come from the assets of his corporation or whether they were the result of laundered money?" Bank of Trade Ex. 12 (memo to Howard Baker from director of Dinner Committee).

Republican Party fund-raisers say they are entitled to a $500,000 contribution by an elusive Los Angeles entrepreneur, despite claims by the Los Angeles district attorney that the entrepreneur is a "deadbeat dad" who owes more than $100,000 in back child support payments.

*Id.* This interpleader action was instituted that same month.[6]

Defendant Soon Kojima was twice married to Michael Kojima. Their first marriage ended in divorce in 1978,[7] while their second marriage lasted from 1984 to 1990. Soon Kojima claims that she loaned her husband $100,000 in late 1989 with the understanding that the loan was necessary for a business venture and that it would be repaid by February 1, 1990.[8] On August 3, 1990, the Clark County Nevada District Court entered a judgment dissolving the second marriage and ordering payment of $100,000 plus interest and child support. Kojima Ex. 2. This Nevada judgment was registered in California but remains unsatisfied.[9] In her counterclaim, defendant Soon Kojima seeks $100,000 under the Nevada judgment and $22,300 in total child support owing under both judgments.[10]

Defendant Bank of Trade, a California bank, also lays claim to the disputed funds presently controlled by the 1992 Committee. On December 31, 1990, the Superior Court of California granted Bank of Trade a creditor's judgment in the amount of $586,000 against Michael Kojima. Bank of Trade seeks to have its state judgment accorded full faith and credit and to have its claim given priority over the claim of the 1992 Committee.

Defendant Topanga Plaza Limited Partnership ("Topanga"), a California partnership, is also a judgment creditor of Michael Kojima. Topanga's claim stems from a creditor's judgment issued by the Superior Court of California on January 6, 1989. That state judgment was in the amount of $119,975.81.[11]

## II. *Analysis*

Fed.R.Civ.P. 56(c) permits a court to grant summary judgment when the evidence in the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

### A. *Application of Fraudulent Conveyance statutes to Political Organization*

■ The Court deals initially with the constitutional issues posed by plaintiff. The 1992 Committee argues that because its fundraising activities are designed to support political candidates, "[t]he First Amendment has its 'fullest and most urgent application'" in the case at bar. Plaintiff's opposition, p. 14 (*citing Buckley v. Valeo*, 424 U.S. 1, 15, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976)). While the Court recognizes that fundraising is needed for the effective dissemination of a political message, we conclude that fraudulent conveyance statutes do not significantly

---

**6.** Plaintiff invokes statutory interpleader, 28 U.S.C. § 1335, which merely requires that two claimants be residents of different states. *State Farm Fire & Casualty Co. v. Tashire*, 386 U.S. 523, 87 S.Ct. 1199, 18 L.Ed.2d 270 (1967).

**7.** Under the first dissolution judgment, Soon Kojima was entitled to $200 per month in child support. She alleges that none of this money was ever paid and now claims $14,200 from this first judgment.

**8.** The purported loan was not repaid prior to the dissolution of the second marriage.

**9.** The Nevada judgment was not registered in California until December 11, 1992, considerably after Michael Kojima's donation to the 1992 Committee. Plaintiff argues that Soon Kojima was not a judgment creditor at the time of the political contribution. However, the Court can

address the claims of defendants as a group without determining whether Ms. Kojima has a valid claim because the aggregate total of defendants' claims, minus Ms. Kojima's, exceeds the $500,000 interpleaded. Ms. Kojima's status will be resolved at a later date.

**10.** There is some question as to whether the Nevada judgment has been at least partially satisfied. *See* Plaintiff's opposition to defendant's motion for summary judgment, Ex. C (transcript of Superior Court hearing establishing schedule for payment of judgment). However, this issue also need not be addressed at this time.

**11.** Two additional creditors of Mr. Kojima were originally listed as defendants. Defendant Chong Kojima, another former spouse of Michael Kojima's, was dismissed from the case at her request on June 9, 1994. The same order also declared defendant Carolina's Pride Seafood, Inc. in default for failure to file a timely answer.

impinge on the right to free speech and no heightened showing is constitutionally required for their application. Plaintiff's claims that the First Amendment is relevant to the issues raised is interesting, but completely irrelevant.

It is well established that government may impose content neutral limitations on the right to free expression. *See e.g. Jimmy Swaggart Ministries v. California Board of Equalization,* 493 U.S. 378, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990) (sales and use taxes on religious articles, in common with other merchandise, do not offend the First Amendment); *Common Cause v. Bolger,* 574 F.Supp. 672, 681 (D.D.C.1982). Such is the situation presented by regulations prohibiting certain transfers made to defraud creditors. These regulations apply to all entities, charitable, political, or private and any effect these regulations might have on expressive activity is incidental. *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989). To hold otherwise would improperly provide political organizations with fundraising avenues otherwise proscribed. *There to Care, Inc. v. Commission of Indiana Dept. of Revenue,* 19 F.3d 1165, 1168 (7th Cir.1994); *cf. In re Young,* 152 B.R. 939, 953 (D.Minn.1993) (fraudulent transfer statute is content neutral).

## B. *Choice of Law Principles*

Federal courts apply the choice of law principles of the jurisdiction in which they sit. *GEICO v. Fetisoff,* 958 F.2d 1137, 1141 (D.C.Cir.1992). The law of the forum is presumed to apply unless it is demonstrated that a foreign jurisdiction has a greater interest in the controversy than does the District. *Kaiser–Georgetown Community Health Plan v. Stutsman,* 491 A.2d 502 (D.C. 1985). In determining which jurisdiction has the greater interest in the litigation, District of Columbia courts follow "a modified 'governmental interests analysis'." *Moore v.*

*Ronald Hsu Construction Co.,* 576 A.2d 734, 737 (D.C.1990) (*quoting Hercules & Co. v. Shama Restaurant,* 566 A.2d 31, 40–41 (D.C. 1989)). This analysis should be based on factors set forth in the Restatement (Second) of Conflicts of Law ("Restatement"), § 145.[12] *See Rymer v. Pool,* 574 A.2d 283, 286 (D.C. 1990).

The parties have suggested three possible jurisdictions with an interest in this litigation. The first two are California and the District of Columbia. Defendants argue that California has a superior interest in the litigation because all of the defendants reside in California. In addition, because Mr. Kojima also lives in California, the 1992 Committee actively solicited him there and the funds were transferred to plaintiff from a California bank account. Plaintiff counters that District of Columbia law should apply because the 1992 Committee is headquartered here, and because the April 28th dinner took place in Washington.

In the alternative, defendants argue that the Court should apply federal common law to the case at bar because the 1992 Committee is regulated by the Federal Election Commission and is organized under federal law. *See F.D.I.C. v. British–American Corporation,* 755 F.Supp. 1314 (E.D.N.C.1991) (federal common law applied to question of fraudulent conveyance when government agency was party to the action).[13] Defendants contend that under a federal common law rule, a court should now apply the Uniform Fraudulent Transfer Act ("UFTA") because it has been adopted by a majority of states.

The Court declines to apply federal common law to the case at bar. In contrast to *British–American,* no government entity is a party to this action and any federal interest in the litigation is at best limited. The Court sees no conflict between the federal interest in free and fair elections and the

12. Those factors are:
  (a) the place where the injury occurred,
  (b) the place where the conduct causing the injury occurred,
  (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

  (d) the place where the relationship between the parties is centered. *Id.,* § 145(2).

13. The Court in *British–American* adopted the Uniform Fraudulent Conveyance Act ("UFCA") in part because, at the time of the funds transfer, the UFCA had been adopted by 24 states.

State's interest in protecting creditor's rights. *O'Melveny & Myers v. Federal Deposit Insurance Corporation,* —— U.S. ——, ——, 114 S.Ct. 2048, 2055, 129 L.Ed.2d 67 (1994) (federal common law rules are warranted only in the limited situations where there is a significant conflict between some federal policy or interest and the use of state law). The Supreme Court in *O'Melveny & Myers* stated:

> [i]f there were a federal common law on such a generalized issue (which there is not), we see no reason why it would necessarily conform to that "independently … adopted by most jurisdictions." [14]

*Id.* at ——, 114 S.Ct. at 2053 (quotation marks in original). Therefore, the mere fact that a majority of states have adopted the UFTA, does not create a federal common law rule, and this Court will apply state law.

■ In determining which State's law should apply, the court must first decide whether there is a conflict between the laws of the relevant jurisdictions. *Eli Lilly & Co. v. Home Ins. Co.,* 764 F.2d 876, 882 (D.C.Cir. 1985), *cert. denied,* 479 U.S. 1060, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987). Such a conflict exists between the laws of California and the District of Columbia. California adopted the UFTA in 1986. California Civil Code § 3439 *et seq.* No intent to defraud is necessary under California law for the transfer to be fraudulent as to a preexisting creditor if

> the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer.

Civil Code § 3439.05.

■ Under District of Columbia law, however, the creditor must prove by clear and convincing evidence that the debtor made the transfer with the actual intent to defraud creditors.[15] *District–Realty Title Ins. Corp. v. Forman,* 518 A.2d 1004, 1008 (D.C.1986); *see also* D.C.Code § 28–3101.

■ The Court believes that on balance the factors weigh in favor of the application of California law. The domicil, residence, place of incorporation, and place of business of the parties is predominantly in California. Although plaintiff is a resident of the District of Columbia, it has no ongoing business here. When plaintiff solicited funds it did so nationally, including in California where the interpleaded funds originated. California is the situs of the relationship between the creditors and the debtor/transferor. The State has a strong interest in insuring that the funds necessary to satisfy judgment creditors are not transferred beyond the reach of resident creditors. In addition, IMB is a California corporation. The Court should look to California law, as the state of incorporation, in determining whether to pierce IMB's corporate veil. *Kalb, Voorhis & Co. v. American Financial Corp.,* 8 F.3d 130, 132–33 (2nd Cir.1993).

## C.  *Uniform Fraudulent Transfer Act*

As noted previously, California law permits the voiding of certain transfers without proof of intent to defraud creditors. Defendants must show the following: that their claim arose before the transfers to the 1992 Committee; that Michael Kojima and IMB did not receive reasonably equivalent value in exchange;[16] and that Kojima and IMB were insolvent at the time or as a result of the transfers.[17] The Court deals separately with each contributor.

> Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied.

---

**14.** A danger of incorporating "majority rules" logic into the federal common law is the lack of stability that results. For example, in the 11 year period since the transfer at issue in *British–American,* the UFTA has replaced the UFCA in a majority of states.

**15.** Defendants have not attempted to show that Kojima acted with an intent to defraud creditors.

**16.** Under California Civil Code § 3439.03 (Uniform Act Section 3(a)):

**17.** As to the two $200,000 transfers from IMB's account, defendants must also show that IMB was at the time of the transfer the alter ego of Michael Kojima and that its status as an independent entity should not shield the funds from Kojima's creditors.

### 1. *Transfer by Michael Kojima from his personal account*

In the final days before the April 28, 1994 dinner, Kojima wrote a $100,000 check from his personal account which apparently secured him a seat at the President's table. With the possible exception of Soon Kojima's claim,[18] plaintiff does not dispute that defendants' claims against Kojima were already in existence at the time of the transfer.

There is no doubt that the consideration given in return for this contribution was minimal, at least when measured monetarily. Plaintiff argues that the Court should consider the rewards of such intangibles as "the value that comes from supporting sound government policies," invitations to various events, and the opportunity to sit at the head table. Plaintiff's opposition, pp. 11–12. Plaintiff's description of the rewards ensuing to contributors is tawdry and cynical.

The question of what constitutes valuable consideration always confronts courts in determining the nature of transfers to non-profit organizations.[19] If a non-profit or charity returns consideration of equal value then the transaction would take on the character of an exchange rather than a donation. From a creditor's perspective, such donations may cause the rapid dissipation of assets which could render the debtor insolvent. For this reason courts have been reluctant to place a value on non-monetary consideration. For example, in *Zahra Spiritual Trust v. U.S.*, 910 F.2d 240, 248–49 (5th Cir.1990), the Court of Appeals refused to recognize "spiritual fulfillment" as appropriate consideration for purposes of determining whether a transfer to a charity violated the fraudulent conveyance statute. *See also In re Young*, 152 B.R. at 948–49. We agree with this conclusion and believe it applies in the context of this case. Therefore, the Court holds that no reasonable trier of fact could find that Kojima received reasonably equivalent value in exchange for his donation to the 1992 Committee.

The next question is whether Michael Kojima was insolvent at the time of his $100,000 donation or was rendered insolvent as a result of the transfer. A creditor must show that the debtor has not retained or does not possess other property sufficient to satisfy the outstanding debt. 37 Am.Jur.2d, Fraudulent Conveyances, § 173. The logic of this requirement is that it forces creditors to look to and attempt to reach the remaining assets of the fraudulent conveyor before disrupting transactions that involve outside parties. California courts have consistently required such a showing except in cases of actual fraud or personal intent to defraud. *Reddy v. Gonzalez*, 8 Cal.App.4th 118, 123, 10 Cal.Rptr.2d 55 (1992); *Fross v. Wotton*, 3 Cal.2d 384, 389, 44 P.2d 350 (1935).

Because it is difficult for creditors to establish a debtor's insolvency when the debtor has firm control over most evidence of indebtedness, California law holds that a "debtor who is generally not paying his or her debts as they become due is presumed to be insolvent." Civil Code § 3439.02(c). Section 3439.02(c) "establishes a rebuttable presumption of insolvency from the fact of general nonpayment of debts as they become due." *See* Legislative Committee Comments—Assembly, 1986 Addition, section 3. The California Legislature has indicated that nonpayment of debts should be broadly construed to include situations where debtor did not pay three largest debts, while still paying smaller debts. *Id.* (citing *In re Hill*, 8 B.R. 779 (D.Minn.1981)). The Court holds that the nonpayment of several outstanding state judgments creates a similar presumption of insolvency.

The rebuttable presumption of insolvency, however, can be overcome if the party against whom the presumption is sought successfully carries the burden of proving that it is more probable than not that the debtor's assets are greater than the sum of his or her debts. Legislative Committee Comments. The 1992 Committee argues that the existence of other assets effectively rebuts this presumption. We do not accept this argument because the evidence of such other

---

18. See *supra* note 9.

19. The Court seeks guidance from the somewhat analogous context of charitable donations.

assets is too weak to overcome the presumption.

Plaintiff argues that Michael Kojima had significant personal assets in the month following his $100,000 donation, however, his bank records indicate that at the end of May his bank balance was $6,892.61, and by mid July, his balance was zero.[20] Plaintiff also lists several real properties allegedly owned by Michael Kojima. Defendant Bank of Trade did in fact attempt to levy on at least one of the properties listed, only to learn that it apparently was owned by a different Michael Kojima. Bank of Trade, Ex. 3.

Defendants' efforts to secure Kojima's assets has been hampered by plaintiff's unwillingness to divulge the bank account numbers of either Kojima or IMB until almost a year after the initiation of this interpleader action. Because of the unique posture of this case in which the debtor is not a party, defendants have had few means with which to trace Kojima's assets. "[I]f such other property is not sufficient to satisfy the debt or has been conveyed away or hidden ... the creditor has a right to choose the [fraudulent transfer] which he will attack." 37 C.J.S. Fraudulent Conveyances § 328. The Court holds that defendants have met their burden of showing that the debtor had insufficient other assets with which to satisfy judgment.

We conclude that defendants have shown that the transfer was a fraudulent conveyance as defined by California law and that defendants have a superior claim to the $100,000. This is true even if, as plaintiff alleges, a *prima facie* presumption of ownership arises in the context of a funds transfer simply from possession. Defendants have made a showing sufficient to defeat any presumption of ownership plaintiff might have gained through possession of the $100,000. *See United States v. Wright*, 610 F.2d 930, 939 (D.C.Cir.1979) (possessor must come forward with additional evidence of ownership beyond mere control when there are serious reasons to doubt the possessor's right to the property).

### 2. Transfers from IMB

A different situation is presented by the two $200,000 checks drawn on the bank account of IMB. Defendants argue that they also have a claim on these transfers because IMB is the alter ego of Michael Kojima.[21] To prevail on an alter ego claim under California law, the claimant must show (1) there is such a unity of interest that the separate personalities of the corporation and the individual no longer exist; and (2) inequitable results will follow if the corporate separateness is respected. *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal.App.2d 825, 836–37, 26 Cal.Rptr. 806 (1962). Before piercing the corporate veil, there must be factual evidence of inadequate capitalization, commingling of assets, or disregard of corporate formalities to support a finding that the separate personalities should not be maintained. *Tomaselli v. Transamerica Insurance Co.*, 25 Cal.App.4th 1269, 1284–86, 31 Cal.Rptr.2d 433 (1994).

There still remain genuine issues of material fact precluding the Court from ruling that IMB is the alter ego of Michael Kojima. Much of defendants' supposed evidence is in fact conclusory statements.[22] The principal hard evidence presented is that IMB's corporate status was suspended by the State of California for nonpayment of taxes on August 3, 1992. This suspension, however, occurred after the period of the donation. Even if the suspension should be considered, a corporation continues to exist during the period of suspension. *United States v. Standard Beauty Supply Stores, Inc.*, 561 F.2d 774, 777 (9th Cir.1977). Sus-

**20.** Plaintiff has not introduced any recent bank records to indicate the current status of Kojima's finances.

**21.** Holding the corporation liable for the debts of the individual is known as "reverse piercing." *Zahra*, 910 F.2d at 243–44 (what makes reverse piercing unique is that rather than merely holding one entity accountable for the acts of the other, it "treats the individual and the corporation as 'one and the same' ") (*citing* 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 41.70 at 458–59).

**22.** For example, defendants contend, without factual support, that IMB has no business operations. In fact the record shows only that defendants are not aware of any such operations. Defendants assert that IMB is undercapitalized but provide little support for this assertion.

pension alone is not sufficient grounds to pierce the corporate veil. *Id.*

Finally defendants argue that there is evidence that Kojima "laundered" his personal assets through IMB's bank account. Considering the record as it now stands, it is at best unclear whether funds deposited in IMB accounts were laundered directly to the 1992 Committee.

The Court believes further discovery is necessary to determine whether IMB was the alter ego of Michael Kojima. Defendants will be granted an additional 75 days of discovery, including the opportunity to depose officers of IMB as previously sought. *Labadie Coal Co. v. Black,* 672 F.2d 92, 100 (D.C.Cir.1982) (party alleging alter ego theory "should be allowed the fullest discovery" into financial records). Although the Court is concerned that defendants have been dilatory in pursuing discovery in the past, we recognize that their burden has not been eased by plaintiff. Therefore, in the interest of fairness, the Court grants this limited discovery extension.

### III. *Conclusion*

For the foregoing reasons, the Court denies plaintiff's summary judgment motion and grants in part the summary judgment motions filed by defendants Soon Kojima, Bank of Trade, and Topanga Plaza Limited Partnership. Because we conclude that questions as to material fact exist concerning the status of IMB, defendants' motions are denied to the extent they claim ownership of the $400,000 donated by IMB.