79 F.3d 1154
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
In re ROXFORD FOODS LITIGATION.
PURINA MILLS, INC., Plaintiff--Cross-Appellee,
v.
CIVIC CENTER SQUARE, INC.; Caisse Nationale de Credit
Agricole, Defendants,
and
John TUTELIAN, Defendant--Cross-Appellant.
In re ROXFORD FOODS LITIGATION.
PURINA MILLS, INC., Plaintiff-Appellant,
v.
CIVIL CENTER SQUARE, INC.; John Tutelian; Caisse Nationale
de Credit Agricole, Defendants-Appellees.
 Nos. 94-15148, 94-15100.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 16, 1995.
Decided March 13, 1996.
 
 1
 Before: SCHROEDER and ALARCON, Circuit Judges, and WHALEY*, District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 This action arises out of losses suffered by Purina Mills, Inc. ("Purina") when Roxford Foods, Inc. ("Roxford") closed in 1989, thereby breaching the Turkey Marketing and Management Agreement between the two companies. After obtaining judgement on this issue, and upon realizing that Roxford was insolvent, Purina sought to recover its damages from John Tutelian and Civic Center Square, Inc. on the theory that each was Roxford's alter ego and each participated in misrepresentations to Purina. On appeal, John Tutelian and Civic Center Square challenge the rejection of their claims in the District Court's 1993 Judgement and in the underlying Findings of Fact and Conclusions of Law.
 
 
 4
 On cross-appeal, John Tutelian challenges the District Court's decision to hold him liable as a constructive trustee for Roxford's violations of the Packers and Stockyards Act and the California Producer's Lien Act.
 
 
 5
 * FACTUAL BACKGROUND
 
 
 6
 This case principally involves John Tutelian ("John") and his son, Clifford Tutelian ("Clifford"). From 1958 until 1982, John was the sole shareholder of Poultry Transport Service, Inc. ("Service"), a turkey hauling company. John was also the sole director and shareholder of Civic Center Square, Inc. ("CCS"), a corporation he founded in 1977.
 
 
 7
 In 1982, John gave Clifford 67 of Service's 220 shares issued and outstanding. In August 1984, the remaining shares in Service were transferred to Clifford by means of a redemption of John's shares in Service.[1] Thus, Clifford held 100% of Service's stock, subject to various security devises. Following the redemption, in August 1984, Service purchased a company which was subsequently named Poultry Transport Systems ("Systems").
 
 
 8
 In 1985, Clifford conceived of the idea of starting Roxford Foods which, as he envisioned it, was to be a fully integrated turkey processing business in Fresno, California. Initially, in 1986, Service did business as Roxford Foods. Later, on July 17, 1987, Roxford Foods was incorporated with Clifford as its president and Charles Bud Long ("Bud") as its Vice President. By the time this litigation was instituted, Service (which was wholly owned by Clifford) held 88% of the Roxford's stock and Clifford held the remaining 12%.
 
 
 9
 Although many of Roxford's construction and operating expenses were paid by Systems from 1986 through 1988, Roxford, Service, and Systems substantially observed corporate formalities. The two exceptions to this involved the failure to execute formal corporate documents memorializing the payment by Systems of the above-mentioned expenses, and the execution of an after-the-fact note in the amount of $400,000 which was used to satisfy documentation requirements of one of Roxford's creditors.
 
 
 10
 In February 1988, Roxford contacted Purina in hopes of obtaining additional sources of live turkeys. During negotiations, Purina was provided with the above-mentioned financial information from Roxford, in addition to information from one of Roxford's other creditors, Rabobank Netherland ("Rabobank"). Clifford and Rabobank advised Purina that Roxford's equity would be comprised of approximately $2 million in cash, real property equities, and letters of credit. In actuality, financial statements dated March 22, 1988 indicated that Roxford held only $1,490,000 in capital stock at that time.
 
 
 11
 Purina specifically requested copies of financial statements for Roxford, but Clifford denied that statements such as the March 1988 balance sheet existed, promising to produce them when they became available. Despite subsequent, repeated requests from Purina, Clifford continued to deny the existence of any financial statements for Roxford until February, 1989. Nonetheless, Purina executed the Turkey Marketing and Management Agreement ("TMMA"). Despite its belief prior to the execution of the TMMA that Roxford was thinly capitalized and that the TMMA was a high-risk investment, Purina entered into the contract. It did so because it perceived the high risk to be justified by the projected rate of return. Neither John nor CCS participated in the negotiations leading to the execution of the TMMA.
 
 
 12
 Beginning in January of 1989, John permitted Clifford to draw down on his $500,000 line of credit with Union Bank because of cash flow difficulties experienced by Roxford. John insisted on receiving repayment of the credit line draws by assignment of proceeds received from Norbest, Inc. ("Norbest"). Norbest was a turkey processing cooperative which provided marketing for Roxford's turkey products pursuant to a 1986 contract with Service and Roxford. Roxford used this line of credit three times, following each of which John received an assignment and was repaid. During July, August, and September 1989, John was repaid $625,000 from the Norbest proceeds in this manner. These funds were found by the District Court to be subject to a Packers and Stockyards Act trust for which Purina was a beneficiary.
 
 
 13
 On several other occasions during Roxford's existence, CCS and John provided financial backing to Roxford often when Purina was considering whether or not to expand its relationship with Roxford. Throughout April of 1989, Purina negotiated with Clifford, Bud,[2] and another of Roxford's creditors. They confirmed CCS's commitment to infuse equity capital into Roxford. Purina was a participant throughout these negotiations and was aware of their conditional nature throughout.
 
 
 14
 Although the District Court found misrepresentations were made by Bud and Clifford throughout their dealings with Purina, nowhere did it find that misrepresentations were made by John or CCS. In fact, the Court specifically found that Purina never changed its position in reliance on any actions or representations of John or CCS.
 
 
 15
 On September 25, 1989, Roxford closed. At that time, Purina was owed $4.3 million dollars for turkeys delivered but for which payment had not been received. Upon learning that Roxford was closing, Purina notified Roxford that it was canceling the TMMA.
 
 II
 PURINA'S ALTER EGO LIABILITY CLAIMS
 
 16
 The District Court rejected Purina's claims that John and CCS should be held liable as alter egos of Roxford. As a matter of law, it found that alter ego liability could not be imposed on an individual with no ownership interest in the Defendant corporation. As a matter of fact, it found that John and CCS were mere creditors of Roxford who did not control or dominate the corporation.
 
 
 17
 The two requirements for disregard of the corporate entity are:
 
 
 18
 (1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.
 
 
 19
 Automotriz Del Golfo De California S.A. De C.V. v. Resnick, 47 Cal.2d 792, 796, 306 P.2d 1, 3 (1957). It is the first of these requirements--unity of interest and ownership--which is to be considered in this appeal.
 
 
 20
 Whether the evidence has established that the corporate veil should be disregarded is primarily a question of fact. Las Palmas Assoc. v. Las Palmas Ctr. Assoc., 235 Cal.App.3d 1240, 1248; 1 Cal.Rptr.2d 301, 317 (Cal.Ct.App.1992). Findings of fact are not to be set aside unless clearly erroneous, i.e., where the reviewing court "is left with a definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). The trier of fact cannot be reversed simply because this Court would have decided the case differently. See Anderson v. City of Bessery, N.C., 470 U.S. 564, 573, 574 (1985). Given the complete absence of any indication that the District Court committed error, this Court accepts as true the factual findings relating to the issue of alter ego liability.
 
 
 21
 The Court independently reviews the lower court's conclusions of law regarding whether California law requires an ownership interest in order to impose alter ego liability. Matter of McLinn, 739 F.2d 1395 (9th Cir.1984) (en banc ). A California case, Riddle v. Leuschner, 51 Cal.2d 574, 335 P.2d 107 (1959), is dispositive of this issue.[3] In Riddle, a corporation sued Yosemite Creek Company ("Yosemite"), Kadota Creek Company ("Kadota"), and individuals Richard Leuschner, Sr. ("Leuschner, Sr."), Elizabeth Leuschner ("Mrs. Leuschner"), his wife, and Richard Leuschner, Jr. ("Leuschner, Jr."), his son. The plaintiff alleged that each of the Leuschners were alter egos of Yosemite and Kadota.
 
 
 22
 The Supreme Court affirmed the lower court's conclusion that both corporations were, in fact, controlled and dominated by the Leuschners. Significantly, though, liability was imposed on each individual according to his or her stock ownership. Thus, Leuschner, Sr., who owned no stock in either corporation and had no right to their profits, did not have the "unity of interest and ownership" needed to impose alter ego liability. Riddle, 51 Cal.2d at 580.
 
 
 23
 Similarly, neither John nor CCS had an ownership interest sufficient to impose alter ego liability. John never held any shares or other ownership interest in Roxford. Although he once held stock in Roxford's parent company, Service, even that ownership interest terminated in 1984.
 
 
 24
 Nor does John's status as the pledgee of stock in Service (which owned 88% of Roxford) rise to the level of ownership needed to impose alter ego liability. See Firstmark, supra; Lawrence v. I.N. Parlier Estate Co., 15 Cal.2d 220 (1940 ("it is the settled rule that a pledgor retains the ownership of his stock, and that a pledgee has a mere lien thereon....").
 
 
 25
 The District Court did not err in finding as a fact that CCS lacked an ownership interest in Roxford sufficient to render it liable as an alter ego. CCS held no ownership interest in Roxford. Instead, Roxford was wholly owned by Clifford, directly as holder of 12% of the its shares, and indirectly as the sole owner of Service which held 88% of Roxford's shares. CCS's sole involvement in Roxford was as a creditor and as an entity which offered financial accommodations for an expected fee.
 
 III
 
 26
 FRAUD, LACK OF CONSIDERATION, AND INADEQUATE CAPITALIZATION
 
 
 27
 Purina also argues that the stock redemption by John was either a fraud or that it never occurred because consideration was never paid. This issue was waived because it was raised for the first time on appeal and does not present any of the exceptional circumstances which might otherwise militate in favor of consideration. In re Professional Inv. Properties of America, 955 F.2d 623, 625 (9th Cir.1992).
 
 IV
 MISREPRESENTATION
 
 28
 Purina challenges as clearly erroneous the District Court's findings rejecting its misrepresentation claim. Whether any misrepresentations occurred, as well as the reasonableness of a party's reliance on such misrepresentations, are questions of fact to be accepted by this Court unless clear error has been demonstrated. See Guido v. Koopman, 1 Cal.App.4th 837, 843, 2 Cal.Rptr.2d 437, 440 (Cal.Ct.App.1991). Despite the assertion of error, Appellants do not identify evidence or testimony which would demonstrate that the District Court's conclusions were clearly erroneous. As such, Purina's misrepresentation argument fails.
 
 V
 
 29
 PURINA'S CLAIMS UNDER THE PACKERS & STOCKYARDS ACT AND THE
 
 CALIFORNIA PRODUCER'S LIEN ACT
 
 30
 In his Cross-Appeal, John challenges the District Court's conclusion that he was liable to Purina as a constructive trustee for conversion of the funds transferred to him in violation of the California Producer's Lien Act (Cal.Food & Agric.Code §§ 55631-55653) (West 1995) ("the CPLA") and the Packers & Stockyards Act (7 U.S.C. § 197) (West 1995) ("the PSA"). The District Court found John violated the PSA and the CPLA, and imposed the $625,000 judgment against him for both violations.
 
 A. The Packers and Stockyards Act
 In pertinent part, the PSA provides:
 
 31
 All poultry obtained by a live poultry dealer, by purchase in cash sales or by poultry growing arrangement, and all inventories of, or receivables or proceeds from such poultry or poultry products derived therefrom, shall be held by such live poultry dealer in trust for the benefit of all unpaid cash sellers or poultry growers of such poultry....
 
 
 32
 7 U.S.C. § 197.
 
 
 33
 The Court made factual findings that John, CCS and Roxford Foods agreed to assign proceeds subject to a PSA trust (for which Purina was the beneficiary) to Union Bank in order to reimburse John for Roxford's draws on his $500,000 personal line of credit. The court found that a total of $625,000 had been transferred in violation of the PSA and the CPLA. John was found to have had constructive knowledge of the trust nature of the proceeds assigned to Union Bank and thus could be made to disgorge the proceeds wrongfully assigned through the equitable remedy of a constructive trust.
 
 
 34
 The existence of actual or constructive knowledge is a question of fact and will not be disturbed absent clear error. Hansen v. Western Greyhound Retirement Plan, 859 F.2d 779 (9th Cir.1989). The District Court's finding that John had constructive knowledge of the trust character of the proceeds was specifically based on the following:
 
 
 35
 (1) John's "long-standing and extensive involvement in the turkey industry" (Finding No. 99),
 
 
 36
 (2) the fact that "Roxford's repayment obligation to [John] was secured by the proceeds of the sale of turkey products, and by virtue of the assignments," (Finding No. 99),
 
 
 37
 (3) John's knowledge of the source of the proceeds at the time of their assignment (Conclusion No. 22), and
 
 
 38
 (4) John's knowledge of Roxford's cash flow difficulties during the relevant period. (Conclusion No. 22).
 
 
 39
 The Court also found that John insisted he be repaid only from the Norbest proceeds and that he was generally involved, both directly and indirectly, in the financial planning and structuring of Roxford. (See Findings 26, 30, 31, 40, 61, 94). Not only does the record support these findings and the District Court's conclusion, it would also have supported a finding that John had actual knowledge of the trust nature of the proceeds.
 
 
 40
 Having concluded that the record would support a finding of actual knowledge, the Court need not reach John's legal argument that constructive knowledge of the trust nature of the proceeds is insufficient to impose liability.
 
 
 41
 In light of John's knowledge of the PSA trust, a constructive trust was an appropriate method for effecting his disgorgement of the money wrongfully assigned. See e.g., In re Richmond Produce, 669 F.2d at 1011 ("those who receive a transfer of assets from [a commingled PSA trust] with actual or constructive notice of the trust are subject to the claims of the trust beneficiaries") (citation and internal quotation omitted). A constructive trust is intended to prevent unjust enrichment, with equity compelling the restoration to another of property to which the holder thereof is not justly entitled. Taylor v. Polackwich, 145 Cal.App.3d 1014, 1022 (1983); Cal.Civ.Code §§ 2223, 2224. See also Weiss v. Marchus, 51 Cal.App.3d 590, 600 (1975) (constructive trust may be imposed in case of fraud, mishandling, or almost any case of wrongful acquisition or detention of property to which another is entitled). The imposition of a constructive trust was especially appropriate in this instance given John's familiarity with the turkey industry, his status as Roxford's creditor, and his knowledge of Roxford's financial problems.
 
 B. California Producer's Lien Act
 
 42
 The District Court found that Roxford violated the CPLA and imposed a constructive trust on those proceeds, for which John was found to be the trustee. The District Court concluded that John converted the proceeds by assigning them to Union Bank. In relevant part, the CPLA provides:
 
 
 43
 Every producer of any farm product that sells any product which is grown by him to any processor under contract, express or implied, in addition to all other rights and remedies which are provided for by law, has a lien upon such product and upon all processed or manufactured forms of such farm product for his labor, care, and expense in growing and harvesting such product.
 
 
 44
 Cal.Food & Agric.Code § 55631. The lien attaches on all of the delivered product from the date it is delivered by the producer to the processor. Cal.Food & Agric. § 55632 (West 1995). The lien remains on the product only as long as the processor has possession thereof. In re Loretto Winery, 898 F.2d 715, 720-21 (9th Cir.1990); Cal.Food & Agric. § 55634. A producer who remains unpaid after dispossession of the encumbered product may maintain a personal action in order to recover the underlying debt. Cal.Food & Agric. § 55647 (West 1995).
 
 
 45
 A constructive trust is an appropriate mechanism for enforcement of an debt obligation created by the CPLA, where, as here, it will be used to prevent unjust enrichment and to compel the restoration of property to which one is justly entitled. Taylor v. Polackwich, 145 Cal.App.3d at 1022. See also Weiss, supra.
 
 
 46
 A constructive trust is especially well suited to the instant case in light of the CPLA's stated purpose of assuring that producers receive full payment for their farm products. In re Loretto Winery, 898 F.2d at 720. The California legislature has declared that the statutory provision are to be "liberally construed to accomplish the Food and Agricultural Code's purposes" of promoting and protecting the agricultural industry, and protecting the public health, safety, and welfare. In re Loretto Winery, 898 F.2d at 721 (citing Cal.Food & Agric.Code § 3 (West 1986)). Accord McKee v. Bell-Carter Olive Co., 186 Cal.App.3d 1230, 1242, 231 Cal.Rptr. 304, 312 (1986) (PSA is "remedial in purpose and thus entitled to liberal construction").
 
 
 47
 The constructive trust is not defeated by the fact that thing converted by John was money. Although money cannot generally be the subject of a conversion action, an exception is made where the funds converted are specific, identifiable sums. See e.g., In re Littleton, 106 B.R. 632, 635 (9th Cir.B.A.P.1989), aff'd, 942 F.2d 551 (9th Cir.1991). At issue here are precisely such specific, identifiable sums--those sums assigned to Union Bank in July, August, and September of 1989--and thus, the conversion claim does not fail on this ground.
 
 
 48
 AFFIRMED.
 
 
 
 *
 Honorable Robert H. Whaley, United States District Judge for the Eastern District of Washington, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 In the 1984 redemption of John's stock by Service, the agreed upon price for John's stock was $276,000. However, John never actually received the full price. Instead, at the time of the redemption in August 1994, he received $5000 and a note in the amount of $271,071 to be paid in five annual installments of principal and accrued interest. The note was personally guaranteed by Clifford and, in turn, the guarantee was secured by a pledge of Clifford's stock in Service. In October 1985, the first and only annual payment was made. In return for his redeemed shares, John also received a security interest in all of Service's rolling stock
 
 
 [2]
 At that point in time, Bud was Roxford's Vice President and CCS's President
 
 
 [3]
 See also Firstmark Capital Corp. v. Hempel Fin. Corp., 859 F.2d 93, 94 (9th Cir.1988) ("Ownership of an interest in the corporation is an essential part of the element of unity of ownership and interest. If an individual's ownership is not established, the corporation's obligations cannot be imposed on him or her.")