Filed 2/6/14  Saleigh v. C.M. Meiers CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| GENSAR SALEIGH, etc., et al., | B247884 |
| Plaintiffs and Respondents, | |
| v. | (Los Angeles County Super. Ct. No. LS022822) |
| C.M. MEIERS COMPANY, INC., | |
| Defendant and Respondent; | |
| ERIC ROTHMAN et al., | |
| Objectors and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, James A. Kaddo, Judge.  Reversed.

Gersh|Derby, Paul B. Derby and Mane Sardaryan for Objector and Appellant Eric Rothman.

Law Offices of Bovino & Associates, Marcy Railsback; Glickfeld, Fields & Jacobson and Lawrence M. Jacobson for Objector and Appellant Herbert Rothman.

Stone Cha & Dean and Kristi W. Dean for Plaintiffs and Respondents Gensar Saleigh and George Nakao, Inc.

No appearance for Defendant and Respondent.

Herbert Rothman and Eric Rothman appeal the trial court's order amending its judgment affirming an arbitration award to add them as judgment debtors. The Rothmans were officers and shareholders in C.M. Meiers Company (CMM), an insurance brokerage business that was sued by plaintiffs Gensar Saleigh and George Nakao, Inc., dba Capitol Financial Services (collectively CFS) for breach of contract; the suit resulted in an arbitration award against CMM. After obtaining judgment on the arbitration award, plaintiffs successfully moved to amend the judgment to add the Rothmans as judgment debtors on the basis the Rothmans were the alter egos of CMM. On appeal, the Rothmans principally argue that the trial court failed to properly weigh the determining factors in the alter ego analysis and there was insufficient evidence they were the alter egos of CMM. We find insufficient evidence that the Rothmans were the alter egos of CMM, and reverse.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### 1. *Underlying Arbitration*

CMM is in the insurance business. In 2004, CMM entered into an insurance brokerage contract with CFS whereby CFS's book of business was transferred to CMM; commissions would be split 40 percent to CFS and 60 percent to CMM. Neither Herbert nor Eric[1] were parties to the Agreement, which was signed by Herbert as CEO of CMM.

In May 2009, CFS claimed CMM breached the contract.

Arbitration proceedings commenced in March 2010 concerning the dispute. Neither Herbert nor Eric were parties to the arbitration. The arbitration lasted more than two years, encompassing hearings held in 2010 and 2011.

On January 9, 2012, CMM filed for chapter 11 bankruptcy.

The arbitration resulted in an award in favor of plaintiffs issued on May 3, 2012. Plaintiffs moved to confirm the award on May 21, 2012, and on October 15, 2012, the

---

[1] To avoid confusion between Herbert and Eric, who share the same last name, we refer to them by their first names.

trial court confirmed the arbitration award of approximately $1.6 million, plus interest, costs, and attorney fees in favor of Saleigh and CFS, and entered judgment thereon.

2. *Plaintiffs' Motion to Amend to Add Herbert and Eric as Judgment Debtors Based on Alter Ego Theory*

On December 28, 2012, plaintiffs filed a motion to amend the judgment to add Herbert and Eric as judgment debtors, contending they were the alter egos of CMM.

The evidence submitted in support of and in opposition to plaintiffs' motion disclosed the following:

(a) Management of CMM

CMM was formed in 1934 by Clarence M. Meiers. In 1950, Mr. Meiers made William Gair his partner. Gair bought out Meiers in 1960 and incorporated the firm with Theodore R. Peterson as a 50 percent co-owner; Peterson bought out Gair in 1969 and made Herbert a 50 percent owner.

CMM was governed by an executive committee consisting of Robert Bryar, Herbert, Jeffrey Kleid and Eric. According to Herbert and Eric, the executive committee made all business decisions for CMM.

Herbert started with CMM as a salesman in 1963. Herbert was president of CMM from 1997 to 2003 and in 2003, Kleid became president, Herbert was made CEO, and Eric became COO. Eric became a vice president in 2004. In 2008, Kleid left CMM and CMM bought out Kleid's interest. Bryar became president of CMM on December 1, 2008, and when he left in September 2011, Dianne Ewing became president, and held that position until January 20, 2012. Eric was head of HR and managed some departments.

From 2003 to 2009, the board of directors consisted of Rebecca Rothman (Herbert's wife), Evelyn Steinberg (Herbert's sister), Wendy Rothman (Eric's wife), Kleid (Herbert's son-in-law), Eric and Herbert. From 2009 to 2012, the board consisted of Rebecca, Evelyn Steinberg, Herbert, and Eric. Thus, the entire board of CMM was composed of members of the Rothman family.

3

During the period 2004 to 2009, Herbert was consulted on major decisions affecting CMM with the president Robert Bryar. Herbert was consulted on legal matters, financial, productivity and profit issues. As CEO, Herbert handled the finance and payment of bills, was part of the executive committee that determined hiring and firing, and managed technology.

Herbert was consulted with respect to the steps taken to transition CFS's book of business in 2004. Herbert, a lawyer, prepared the contract between CFS and CMM.

(b)      Herbert and Eric's Employment Agreements and Book of Business

Both Herbert and Eric had identical employment agreements with CMM dated January 1, 2009 providing their employment was "'at will.'" They received a base annual salary of $240,000, with commissions determined at the end of the year. Both Eric and Herbert owned their own "book of business" (clients, books, lists, contracts, and revenue associated therewith). Herbert and Eric's employment agreements provided their books of business were owned by each of them and could be taken with them if they were to leave CMM. Together, the two books of business are worth $800,000 per year. The employment agreements contained "non-compete" clauses that acknowledged the client information of CMM was confidential and that neither Herbert nor Eric would solicit CMM's clients on their own behalf.

In the insurance industry, it is common for a producer to maintain his or her own accounts as their "book of business." Other employees at CMM had their own books of business, including Bryar, plaintiffs Gensar Saleigh, Derek Ross, Alon Ben-Num, William Kulchin, and others. These employees, and others, also had the option to sell their books of business back to CMM pursuant to their individual producer agreements.

(c)      Share Ownership; CCM's Asset Transfer

As of 2003, CMM's stock was held as follows: Eric, 10 percent, Wendy Rothman, 5 percent; Kleid, 5 percent; and Herbert, 80 percent. Since 2008, Herbert has held 89 percent of the stock to Eric's 11 percent.

4

In a separate action filed by Kleid, on behalf of himself individually and his family trust, against CMM and an entity known as "Affinity Global Insurance Services, Inc.," Kleid asserted Affinity was the alter ego of CMM. Herbert and Eric refuted this allegation, and alleged Affinity was owned by Jason Adelman and formed in 2009. Jason Adelman had no affiliation with CMM, but is the brother of Eric's wife. Herbert contended that CMM intended to transfer its assets to Equitable Transitions, Inc. as a planned assignment for the benefit of creditors, and denied Kleid's allegation that CMM was transferring its assets to Affinity.

(d) Corporate Formalities

Eric Held, a financial consultant, was employed by CMM's bankruptcy trustee to conduct a review of its books and records. Held's review disclosed that CMM was "out of trust" in excess of $ 1 million in January 2012, having net payables to insurance companies in the amount of $1,085.659.14[2] as of January 25, 2012.[3] The trust account had a balance of $11,783.20.

Further, before the filing of CMM's bankruptcy petition, during the period 2005 to 2011, CMM paid Herbert and his wife Rebecca Rothman over $600,000 in rent and mortgage payments for which the Rothmans were the obligor for property located in Newport Beach, California.

CMM owned a $1 million policy on Herbert's life with a cash value of $80,000 as of January 2012. In November 2010, Herbert obtained a loan against the policy of $50,258.53 reducing the cash value of the policy. On January 9, 2012, CMM transferred the policy to Herbert for no consideration.

In November 2011, Eric, Herbert and Rebecca paid $272,032.40 to CMM's trust account.

---

[2] Held's supplemental declaration stated the figure was $1,073,875.94.

[3] Pursuant to Insurance Code sections 1733, 1734, and 1734.5, CMM was required to maintain an insurance premium trust account. Use of the trust account is restricted.

5

On March 30, 2012, Herbert and Rebecca sold the Newport Beach house for $1.835 million, but CMM did not receive any payments on account of the sale.

Herbert and Eric asserted that over the course of its business life, CMM had hundreds of employees, hired independent contractors, obtained and maintained insurance for thousands of customers, was properly licensed to sell policies, regularly paid its taxes, hired accountants, had an excellent reputation and was solvent and profitable, only showing a loss in October 2011.

Herbert and Eric also asserted that CMM hired corporate counsel and followed counsel's advice with respect to registration with the Secretary of State, issuance of stock, licensing, minutes, board of directors' meetings, taxes, and contracts. CMM observed all corporate formalities, was adequately capitalized, held yearly meetings, had its own bank accounts, and did not conceal its ownership or corporate structure. Eric and Herbert asserted they maintained their personal business separately from CMM, did not hold themselves out as liable for CMM's debts, never personally guaranteed CMM's debts, did not sign checks reimbursing themselves for expenses, and were not individually permitted to make decisions for CMM. Herbert denied he commingled his personal funds with CMM's accounts or used corporate funds to pay for homes or automobiles.

Herbert and Eric asserted that since CMM's incorporation, it had complied with all corporate formalities, including regular meetings, stock records, audits, and payment of taxes. However, no party provided copies of any minutes of meetings or other stock records, or indicated that corporate records had been sought but were not produced.

(e)   Control of Litigation with CFS

The Rothmans asserted they did not control the arbitration proceedings: they did not contribute to CMM's defense nor did they hire counsel to represent CMM; rather, CMM's insurer hired the attorneys who represented CMM; they did not appear as individual defendants in the arbitration, appeared only as witnesses; and did not have

6

motivation to defend the arbitration because they did not believe they would be personally liable.

Herbert was present during each of the 15 days of arbitration, while Eric was present on one day that he did not testify. Herbert testified for two and one-half days, while Eric testified for one-half day. Herbert attended the arbitration hearings because counsel for CMM asked him to attend, but he was not involved in the proceedings in terms of strategy and planning for CCM, and only appeared as a witness. Eric contended he did not control the progress of the arbitration, asserting that counsel for CMM did not ask Eric for litigation strategy, ideas, or thoughts regarding conduct of the arbitration. Eric did not contract with or pay the attorneys for CMM. At no time did plaintiffs assert during the two and one-half years of the arbitration that Eric was the alter ego of CMM, so he did not mount a defense on his behalf in the arbitration. Herbert similarly did not mount a defense to the plaintiffs' claims because they did not assert he was the alter ego of CMM and he did not believe he would be personally liable for any judgment against CMM.

(f)     Employment Benefits

From the early 1980s through 2009, CMM had pension and profit sharing plans for every officer who had worked for the company at least for one year up to 10 percent of salary. After 2009, the plans became too expensive and the board did not make further contributions. Holiday bonuses were paid equivalent to two weeks salary; Eric and Herbert received such bonuses. After 2008, CMM paid discretionary merit-based bonuses. Herbert and Eric did not receive a bonus in 2009, 2010, or 2011. CMM made monthly car payments for Herbert, Eric, and other employees including Cathy Kerhulas, Greg Jones, Charlene Hill, Bryar, Ewing, and Kleid. No corporate funds were used to reimburse Eric or Herbert for personal expenses.

Eric and Herbert asserted they did not receive any special "'perks'" from CMM not available to other employees; the Rothmans did not control the board of directors or executive committee of CMM; the Rothmans had their own personal bank accounts

7

which were kept separate from the accounts of CMM; and they never commingled any assets.

Herbert denied he used corporate funds to pay for homes or automobiles. As CMM's CEO from 2002 to 2012, he oversaw day-to-day operations of CMM in consultation with CMM's president and executive committee. Herbert asserted CMM's board of directors met yearly and minutes were taken of its meetings. Herbert maintained separate bank accounts from CMM.

Herbert denied that his 2009 Producer agreement gave him special treatment. On January 9, 2009, Eric and Herbert entered into Producer Employment Agreements. Herbert's salary of $240,000 per year was the same salary received by Bryar, and had remained unchanged since 1997. Under the Producer Agreement, Herbert was not guaranteed minimum commissions of $500 per account. He never received any commissions. Under the Producer Agreement, Herbert was entitled to pension and profit sharing; he received a bonus in 2005 and 2006 of $17,000, the same bonus paid to Eric and Kleid; in 2008, Bryar stopped automatic bonuses and instituted discretionary merit-based bonuses. In 2009, Bryar and several other employees received bonuses; Eric and Herbert did not. CMM paid his car payments, but did so for numerous other employees. Herbert denied that he owned a boat, rented a slip, or that CMM funds were used to purchase a boat or rent a boat slip for him. Herbert also denied that CMM's trust account was short in excess of $1 million or that he put his personal funds into CMM's trust account.

### 3. Parties' Arguments

Plaintiffs primarily asserted that the Rothmans commingled their funds with CMM and were intimately involved with and controlled CMM's conduct of the arbitration. Eric Held, a consultant for the bankruptcy trustee of CMM, had reviewed CMM's books and records and discovered numerous instances of commingling of funds between the Rothmans and CMM; in addition, plaintiffs asserted that the Rothmans, or members of their family, controlled CMM and its board of directors, Herbert and Eric made day-to-

8

day decisions for CMM, Herbert prepared the contract with CFS, and actively participated in the litigation with CFS.

On February 13, 2013, Herbert and Eric filed their memorandum in opposition, arguing that they were not the alter egos of CMM because plaintiffs had not established that, among other things, CMM failed to maintain adequate books and records; CMM was undercapitalized; CMM was a mere shell or instrumentality; CMM disregarded legal formalities of the corporate form; the Rothmans misrepresented or concealed its true ownership; the Rothmans commingled funds or other assets; or the Rothmans treated the assets of CMM as their own. Further, Eric asserted that plaintiffs improperly delayed bringing their alter ego claims because all of the information upon which they relied in asserting such claims was known to them as early as 2004, and in no event later than 2010; furthermore, Saleigh, who was an independent contractor and in CMM's offices on a regular basis, knew of the corporate structure, organization and business operations of CMM, failed to join the Rothmans in the action.

Moreover, Herbert and Eric argued plaintiffs had not shown that an inequitable result would occur if the corporate veil were not pierced because there is no evidence Herbert or Eric engaged in any wrongful act: they did not use the assets of CMM for any improper purpose, did not engineer the bankruptcy to benefit from it (both Herbert and Eric lost their jobs, are experiencing financial difficulty, and have not been repaid for unsecured loans made to CMM), and Herbert and Eric were not parties to the contract with CMM.

Herbert and Eric filed evidentiary objections to (1) plaintiffs' statements that they attempted to transfer the assets of CMM to Affinity through an assignment to Jason Adelman, the owner of Affinity, on the grounds they were conclusory, lacked foundation and were hearsay; (2) plaintiffs' assertions concerning their presence at the arbitration on the grounds of lack of foundation and hearsay; (3) the portions of the arbitration transcripts submitted by plaintiffs on the grounds of lack of authentication; (4) Eric

9

Held's declaration, which was later withdrawn in the bankruptcy proceedings and replaced with an amended declaration, on the ground of lack of foundation.[4]

Plaintiffs responded that their statements were supported by personal knowledge of the Rothmans' attendance at the arbitration, and that the withdrawal and substitution of the Held declaration, which was filed in the bankruptcy proceedings, did not undermine the factual statements made in the original declaration.

In reply, plaintiffs submitted additional evidence in support of their petition, including Held's supplemental declaration and a copy of the written arbitration award. Plaintiffs asserted that the bankruptcy permitted the discovery of the Rothmans' financial records for the first time, and that once the award was rendered, the Rothmans began to "deplete every asset of their company. They misappropriated trust funds, paid personal expenses out of corporate funds, and then filed bankruptcy." Plaintiffs also objected to the Rothmans' evidence on the grounds of lack of foundation, lack of personal knowledge, and hearsay.

Herbert and Eric filed additional evidentiary objections to the materials attached to plaintiffs' reply, asserting that the additional exhibits were untimely, lacked foundation, and consisted of hearsay.

4.    *Trial Court Ruling*

The trial court found Herbert and Eric were the alter egos of CMM, focusing on the following facts:

(1) Herbert owned 89 percent of the stock of CMM;

(2) Herbert personally handled the corporate finances of CMM and was part of the executive committee;

(3) Herbert personally made the decision of CFS to join CMM;

(4) Herbert was the top decision maker above the president, Bryar. Herbert was consulted on all matters of financial productivity and legal action against CMM;

---

[4] The supplemental Held declaration omitted portions of the prior declaration relating to CMM's payment of Herbert's mortgage and rental.

(5) CMM's board consisted of Rothman family members;

(6) Herbert's employment was not "at will";

(7) The Rothmans personally owned the accounts of CMM;

(8) When CMM declared bankruptcy, the Rothmans transferred its accounts to themselves;

(9) Herbert, Eric and Rebecca deposited $272,032.40 into CMM's trust account marked as "loans" for which there was no explanation;

(10) CMM paid Washington Mutual on behalf of Herbert a monthly payment of $9,137.50 from 2006 to 2011, for which there was no explanation;

(11) The life insurance payments were not explained;

(12) There was evidence the Rothmans were aware of the issues presented in the arbitration and participated in the defense;

(13) The arbitrator found that Herbert caused CMM to act in a manner which was noncooperative and obstructionist;

(14) Plaintiffs established their claims for conversion, intentional interference with contractual relations and breach of the covenant of good faith and fair dealing in the arbitration, and the court concluded "[a] company's acts are those of the individuals in control";

(15) The arbitrator found the CMM had engaged in malicious and oppressive conduct.

The trial court overruled the Rothmans' evidentiary objections in their entirety.

On March 14, 2012, the trial court amended the arbitration award to set forth that CMM, Herbert, and Eric were joint and severally liable for the arbitration award in favor of plaintiffs.

## DISCUSSION

Herbert and Eric filed separate briefs. Herbert argues that the trial court erred in finding he was the alter ego of CMM because (1) the court failed to weigh all 13 factors that must be considered in order to find a unity of interest between him and CMM and

11

there was insufficient admissible evidence of such a unity of interest; (2) the court erred in failing to make findings of specific bad faith wrongdoing; (3) the trial court erred without making findings that inequity would result if the alter ego doctrine were not applied; and (4) the trial court erred and violated due process by imposing individual liability on Herbert based on the arbitration proceeding which he did not control.

Eric argues that the trial court erred in finding he was the alter ego of CMM because (1) there was insufficient evidence that he controlled CMM's business affairs; commingled his personal funds with CMM's funds, or used corporate funds to pay for his personal expenses; (2) CMM was adequately capitalized until October 2011; (3) there is insufficient evidence an inequitable result will occur if the corporate veil is not pierced; and (4) Eric did not control or participate in the arbitration.

Plaintiffs argue that sufficient evidence supports a finding that Herbert controlled CMM based on: Herbert was an executive of CMM and was familiar with all aspects of the business; Herbert used corporate money for personal expenses; Herbert never explained why he issued a personal check for money to deposit into the trust account, why corporate funds were used for the boat slip or Herbert's home mortgage; further, Eric participated in the governance of CMM as a member of the board and an officer, was one of only two shareholders, and was complicit in the use of corporate money for the benefit of the Rothmans; and Eric never explained why he deposited his monies into the corporate trust account.

Under Civil Procedure section 187,[5] the trial court is authorized to amend a judgment to add additional judgment debtors. Thus, a court may amend its judgment at any time so that the judgment will properly designate the real defendants. (*Hall,*

---

[5] Civil Procedure section 187 provides, "[w]hen jurisdiction is, by the Constitution or this Code, or by any other statute, conferred on a Court or judicial officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this Code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this code."

*Goodhue, Haisley & Barker, Inc. v. Marconi Conf. Center Bd.* (1996) 41 Cal.App.4th 1551, 1554–1555.)  In particular, a judgment may be amended to add additional judgment debtors on the ground that a person or entity is the alter ego of the original judgment debtor.  (*Carr v. Barnabey's Hotel Corp.* (1994) 23 Cal.App.4th 14, 20–21.) "Amendment of a judgment to add an alter ego 'is an equitable procedure based on the theory that the court is not amending the judgment to add a new defendant but is merely inserting the correct name of the real defendant. . . .'" (*Id.* at p. 21.)

Two requirements must be met before the corporate form will be disregarded pursuant to the alter ego doctrine.  First, "there is such a unity of interest" between the two entities "that the separate personalities of the [entities] no longer exist"; and second, it would promote injustice to continue to recognize the separateness of the two entities. (*Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1285.)  Both requirements of the doctrine must be met, as it "does not guard every unsatisfied creditor of a corporation but instead affords protection where some conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form." (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 539.)

In determining whether to apply the doctrine, the inquiry is fact-intensive.  "There is no litmus test to determine when the corporate veil will be pierced; rather the result will depend upon the circumstances of each particular case." (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300.)  Furthermore, because the inquiry is fact-intensive, we will not overturn the ruling of the trial court if it is supported by substantial evidence. (*Jack Farenbaugh & Son v. Belmont Construction, Inc.* (1987) 194 Cal.App.3d 1023, 1032.)  A judgment against a corporation and its alter ego is enforceable against each separately. (*Mesler v. Bragg Management Co.*, *supra,* 39 Cal.3d at p. 301.)

Numerous factors are considered in determining whether the separateness of the corporate form exists, and include:  "inadequate capitalization, commingling of funds and other assets, disregard of corporate formalities" (minutes, stock issuance, election of

13

officers, segregation of corporate records), "identical equitable ownership in the two entities, and identical directors and officers." (*Brooklyn Navy Yard Cogeneration Partners v. Superior Court* (1997) 60 Cal.App.4th 248, 258.) However, "sound public policy dictates that imposition of alter ego liability be approached with caution." (*Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1249 (*Las Palmas*).)

"'The attempt to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity . . . . [S]hareholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for its prospective liabilities." (*Automotriz del Golfo de California S. A. de C. V. v. Resnick* (1957) 47 Cal.2d 792, 797 (*Automotriz*).) *Automotriz* concluded that "[i]f the capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege." (*Ibid.*)

In *Automotriz*, *supra*, 47 Cal.2d 792, the shell corporation never issued stock, no bank account was opened for the corporation, although one was opened under a dba, the funds for the purchase of inventory were provided by the individual officers of the corporation, not the corporation, the corporation never held title to the inventory, and sales proceeds were deposited into the dba account for reimbursement to the officers. (*Id.* at p. 795.) In upholding alter ego liability, the court pointed to the failure to issue stock as well as the manner in which the business was run as an extension of the individual directors. (*Id.* at p. 798.)

In *Las Palmas*, *supra*, 235 Cal.App.3d 1220, the buyers of a shopping center claimed the seller corporation executed lease guarantees with no intent to honor them, and sought to hold another corporation liable as the alter ego of guaranteeing corporation. The two corporations had common directors; the shell corporation had divested itself of its assets, leaving it undercapitalized, and the corporations shared employees, as the guaranteeing corporation had discharged its employees and become "a shell" with the other corporation's employees transacting its business. (*Id.* at pp. 1232–1234.) The

14

court found these facts justified a finding the two corporations were "combined into a single enterprise to defraud" third parties. (*Id*. at p. 1251; see also *Pan Pacific Sash & Door Co. v. Greendale Park, Inc*. (1958) 166 Cal.App.2d 652, 658–659.) Similarly, in *Pan Pacific*, the corporations (Greendale Park, Inc. and Ralmor, Inc.) had the same stockholders, directors, officers, and occupied the same premises and had common employees. Both corporations were undercapitalized; as the need arose, the corporations made loans to each other. These facts justified alter ego liability, as it would promote injustice and be inequitable for one corporation to avoid an obligation incurred as much for its benefit as for the other corporation. (*Id*. at p. 659.)

Conversely, where a corporation was undercapitalized but the two corporations maintained separate books and records, separate bank accounts, were incorporated at different times, did not share all of the same directors or officers, retained separate counsel, issued stock, had their own employees and kept separate payrolls, maintained corporate formalities, such as minutes and meetings, and did not commingle funds, the facts supported a finding of no alter ego liability. (*Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 841.)

Lastly, we point out that corporate veil analysis differs where liability is to be founded on contract, rather than tort, and a stronger showing is required because contract claimants have voluntarily dealt with the corporation. Presumably, in a consensual transaction, the third party has had the opportunity to ascertain the corporation's creditworthiness and to obtain guarantees, security agreements, liens, or other means of protecting itself. Therefore, unless there is evidence of commingling, misrepresentation, or diversion of corporate assets, alter ego liability will not be imposed. (*Cascade Energy and Metals Corp. v. Banks* (10th Cir. 1990) 896 F.2d 1557, 1577–1578.)

However, to add a party to judgment debtor proceedings, the judgment creditor must show that the party controlled the proceedings and was virtually represented. "Due process 'guarantees that any person against whom a claim is asserted in a judicial proceeding shall have the opportunity to be heard and to present his [or her] defenses.'"

15

(*Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 509.) "Although [Civil Procedure] section 187 has been interpreted to allow flexibility in proceedings, it has never been construed to allow imposition of liability on an entity which was never a party to the action. Cases which have used section 187 to add new parties as additional judgment debtors have always been rooted in the 'alter ego' concept that the original party and the new party were one and the same. Adding the alter ego entity after judgment, therefore, amounted to little more than correcting a misnomer in naming the defendant. [Citation.]" (*Triplett v. Farmer Ins. Exchange* (1994) 24 Cal.App.4th 1415, 1420.) Thus, control of the litigation is established where the nonparty alter ego hired counsel to represent the corporation, was the person with whom the corporate defendant's counsel primarily dealt, was kept fully informed of the suit's progress, was familiar with all the issues, and helped draft documents for the litigation. (*Alexander v. Abbey of the Chimes* (1980) 104 Cal.App.3d 39, 46.)

### A. Herbert

Here, in finding alter ego liability, the trial court primarily relied on Herbert's 89 percent ownership of CMM, Herbert's personal handling of corporate finances, Herbert's decision to have CFS joint CMM, what the trial court found was Herbert's role as "top decision maker." The court also relied on these factors: the composition of CMM's board, which was Rothman family members; the nature of Herbert's employment was not "at will"; what the court deemed to be the Rothmans personal ownership of the accounts of CMM; what the court found to be the transfer by the Rothmans to themselves of the ownership of CMM; the payment by Herbert, Eric and Rebecca of $272,032.40 into CMM's trust account marked as "loans" for which there was no explanation; CMM's payment of Herbert's mortgage and rental; the life insurance payments were not explained; there was evidence the Rothmans were aware of the issues presented in the arbitration and participated in the defense; and the arbitrator found that Herbert caused CMM to act in a manner which was noncooperative and obstructionist.

16

As a threshold consideration, even considering all of the parties' evidence,[6] several of these findings have no support in the record. First, there is no evidence that the assets of CMM were transferred to a third-party entity controlled by the Rothmans, other than plaintiffs' assertion—there are no bank statements, checks, wire orders, or other documentation indicating the transfer of such assets. The parties' factual dispute centers on ownership of Affinity, and not the party to which Herbert made an assignment for the benefit of creditors. Second, there is no evidence Herbert controlled the litigation other than Herbert's presence at the arbitration and his role as decisionmaker at CMM; being "aware" of the issues does not amount to control.

On the other hand, Herbert was the primary owner of the company and transferred CMM's insurance policy to himself without consideration, shortly before bankruptcy several Rothman family members attempted to recapitalize CMM's trust shortfall, and over the course of several years CMM made payments for Herbert's mortgage and rental expenses. These facts indicate a permeable barrier between the Rothman family finances and CMM's finances primarily with respect to Herbert over a period of time, but do not establish that CMM was merely the alter ego of Herbert and had no separate corporate identity. First, several of the facts supporting alter ego (payments to bring the CCM trust account current and the transfer of the insurance policy) were recent and occurred just before to CMM's bankruptcy, and more likely signify a fraudulent conveyance (Civ. Code, §§ 3439–3439.12), a preferential transfer (11 U.S.C. § 547), or misappropriation of corporate funds, as this activity lacks the pervasiveness needed to establish alter ego liability. Second, there has been no showing corporate formalities were not observed: No corporate records were produced that would have established a lack of maintenance of corporate minutes, board meetings, and resolutions. Furthermore, CMM employed

---

[6] On appeal, both parties reassert their evidentiary objections raised below. As we conclude that, based on all of the evidence, insufficient evidence establishes alter ego liability, we need not consider the parties' objections.

17

numerous other brokers with their own books of business, had been in the insurance business since 1934, and had operated normally before filing bankruptcy.

For these reasons, we cannot conclude that it would promote injustice to continue to recognize the separateness of the corporate form of CMM. Thus, while there are factual indicia similar to those to establish alter ego liability, overall these facts do not show that CMM was the mere instrumentality and shell of Herbert's insurance business. Plaintiffs have not met their burden of establishing alter ego liability on the part of Herbert for CMM's debts.

**B.     Eric**

Even more so than Herbert, there is insufficient evidence Eric was the alter ego of CMM. There is no evidence that Eric negotiated or drafted the contract with CFS, that he directed the arbitration, other than appearing at a hearing and observing some of the proceedings; and there was no evidence Eric's funds were commingled with CMM or that CMM paid any of Eric's personal expenses other than those in the ordinary course of business; and there was no evidence Eric participated in any purported transfer of CMM's assets to a third party. Thus, although there was evidence CMM's corporate formalities were not observed and Eric was an officer of CMM and potentially responsible for this oversight, as well as evidence CMM was undercapitalized, there was no evidence that Eric caused any of these conditions. Finally, there is absolutely no evidence that Eric directed the litigation by engaging in consultation with attorneys, discussing strategy, or proposing potential settlement or other resolution of the action. As a result, the trial court erred in finding Eric was the alter ego of CMM and in amending the judgment to find him personally liable for CMM's debts.

## DISPOSITION

The order amending the judgment on Gensar Saleigh and George Nakao, Inc.'s arbitration award to add Herbert Rothman and Eric Rothman as judgment debtors is reversed. Appellants are to recover their costs on appeal.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


CHANEY, Acting P. J.


MILLER, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.