Filed 9/21/20  Carter v. Landa CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JOHN PENN CARTER, APC,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ENRIQUE LANDA et al.,<br><br>Defendants and Appellants. | D075353<br><br><br><br>(Super. Ct. No. ECU09474) |

APPEAL from a judgment of the Superior Court of Imperial County, Jeffrey Bruce Jones, Judge.  Affirmed.

Williams Iagmin and Jon R. Williams for Defendants and Appellants.

Horton, Knox, Carter & Foote, Orlando B. Foote and Margarita Haugaard for Plaintiff and Respondent.


Defendant-entrepreneur Enrique Landa hired plaintiff-attorney John Penn Carter to help him pursue three ambitious water projects.  But he never paid Carter.  Having lost the resulting suit brought by the attorney for recovery of fees, Landa now challenges two aspects of the trial court's ruling, notably its use of the alter ego doctrine.  We affirm, finding sufficient evidence to support the result.

FACTUAL AND PROCEDURAL BACKGROUND

In 2013, Landa hired Carter, an attorney with expertise in water rights, to help him pursue three interrelated cross-border water projects. They had worked together previously in 2006 on a water project that never materialized. Landa's vision for the 2013 projects was three-fold. First, he would secure authorization and financing for two plants—one for wastewater treatment and one for desalination—that would collectively reduce dependence on water from the Colorado River in both Northwest Mexico and the Southwestern United States, leaving conserved river water in the Tijuana Aqueduct that could then be sold back to public entities in the United States at a reduced rate. He named each of these components: PURA for wastewater treatment, Nuevagua for desalination, and Diagua for conserved river water.

Carter worked on these projects from 2013 through 2015. Landa, who often formed multiple LLCs to house his business ventures, was Carter's point of contact even as his corporate client changed. In February 2013, Carter started working under the Diagua name, though it took it took until June for the two men to sign Carter's engagement letter, which he redrafted at Landa's instruction to name Endol, LLC (Endol) as his client. Landa signed the letter in his capacity as manager of Endol. About a month later, Landa informed Carter that the newly formed Nuevagua, LLC (Nuevagua) would be substituted for Endol as Carter's client.

In subsequent months, Carter and Landa discussed a reduction in Carter's fees patterned after their 2006 agreement, in which Carter deferred payment for half of his billable hours in exchange for an equity share in the water project if it was successful. Although the previously signed engagement letter did not specify any deferment or contingency fee

2

arrangement, subsequent e-mails between Landa and Carter indicate that their understanding shifted over time. But the two men never explicitly settled on the amount Carter would defer, or the nature of the benefit he would receive if the venture was successful. In the meantime, Landa expressed some sticker shock after seeing Carter's first invoice. Carter offered to go over the billing with him, and eventually met with someone on Landa's behalf to discuss both the billing and the fee arrangement—but this never led to any revised agreement.

By late 2014, it became clear that the Nuevagua project would not gain the requisite approval Landa was seeking from the Mexican government. Shortly afterward, Landa also discovered a significant legal barrier to the Diagua project. He elected to wind the projects down. Despite repeated requests for payment, Carter had not yet been compensated for any of his time. In 2016 Carter brought suit against Endol, Nuevagua, and Landa to recover his fees, pleading express breach of contract and quantum meruit. Landa dissolved Nuevagua in 2017.

After a five-day bench trial, the court ruled in Carter's favor, awarding him half of his fees, plus interest. It made specific findings that (1) Carter's fees were reasonable given his industry connections, (2) Carter and Landa had an implicit agreement to defer half of Carter's fees and award him either a future equity interest in Nuevagua (Carter's understanding) or a cash bonus (Landa's understanding) if the project was successful, and (3) Landa is the alter ego of Endol and Nuevagua. Applying the alter ego doctrine, the court held Landa personally liable for the corporate debt incurred for Carter's services.

DISCUSSION

On appeal, Landa challenges the court's decision on two grounds, claiming the alter ego finding is unsupported by the evidence and that Carter's pursuit of an equity interest in Nuevagua was an ethical violation that should bar his recovery of any fees. We are unpersuaded by either contention. As we explain, there was sufficient evidence to support the court's application of the alter ego doctrine, and the specific ethical violations Landa hypothesizes never materialized in this case. We accordingly affirm the trial court's decision.

1.    *Alter Ego*

Corporations are generally respected as legally distinct entities, separate from those who control and benefit from them. (*Communist Party v. 522 Valencia, Inc.* (1995) 35 Cal.App.4th 980, 993 (*Communist Party*).) But when necessary to uphold "justice and equity" and avoid "fraud and unfairness," their separate existence can be set aside by application of the alter ego doctrine. (*Kohn v. Kohn* (1950) 95 Cal.App.2d 708, 718.) Whether this remedy at equity is appropriate in any given circumstance is a factual determination that falls within the purview of the trial court. (*H.A.S. Loan Service v. McColgan* (1943) 21 Cal.2d 518, 523; *Stark v. Coker* (1942) 20 Cal.2d 839, 846.) In recognition of this, appellate courts have abstained from prescriptive guidance and adhere instead to general principles. (*Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 837 (*Associated Vendors*).) Two elements "must be found to exist before the corporate existence will be disregarded," namely (1) "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist," and (2) "an inequitable result" would flow from

4

upholding the separation.  (*Ibid.*; *Automotriz del Golfo De California S.A. de C.V. v. Resnick* (1957) 47 Cal.2d 792, 796 (*Automotriz*).)

California courts consider numerous factors in deciding whether disregard of a corporation's separate existence is merited.  (See *Associated Vendors*, *supra*, 210 Cal.App.2d at pp. 838–840 [providing an overview of the various factors].)  Failure to observe corporate formalities, such as commingling of funds and failure to invest sufficient capital to make a corporation solvent are often invoked as grounds for a finding of alter ego. (See *Riddle v. Leuschner* (1959) 51 Cal.2d 574, 581–582; *Goldberg v. Engelberg* (1931) 34 Cal.App.2d 10, 13; *Stark v. Coker* (1942) 20 Cal.2d 839, 846–848; *Minton v. Cavaney* (1961) 56 Cal.2d 576, 578–580; *Automotriz, supra,* 47 Cal.2d 792.)  A corporation's control and domination by one individual is another factor tending to show unity of interest.  (*D.N. & E. Walter & Co. v. Zuckerman* (1931) 214 Cal. 418, 420.)  While no one factor is dispositive, undercapitalization is an important consideration.  (See *Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 812; *Associated Vendors*, *supra*, 210 Cal.App.2d 825; *Auer v. Frank* (1964) 227 Cal.App.2d 396, 409; *Automotriz*, at p. 797, quoting from Ballantine on Corporations (rev. ed. 1946), at pp. 302–303 ["If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege"]; *Shapoff v. Scull* (1990) 222 Cal.App.3d 1457, 1470 ["The requirements of the [alter ego] doctrine may be met where, as here, the corporation is undercapitalized in light of its prospective liabilities."].)

There are only a few general boundaries governing the second element of an inequitable result.  Plaintiff cannot satisfy this element merely by demonstrating it is an unsatisfied debtor.  But it need not prove actual fraud either.  (*Gordon v. Aztec Brewing Co.* (1949) 33 Cal.2d 514, 523; *Sonora*

5

*Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 539; *Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1074.) The key question is whether the plaintiff has shown that an injustice would be accomplished absent the court's use of alter ego. When after considering these factors, a trial court is satisfied that the protections of the corporate form should be disregarded, we will not overturn such a decision unless it is unsupported by substantial evidence. (*Alexander v. Abbey of the Chimes* (1980) 104 Cal.App.3d 39, 46–47.)

Landa claims there was insufficient evidence to demonstrate his unity of interest with the LLCs and that no injustice could flow from adhering to the corporate form because Carter is no more than an unsatisfied debtor of a defunct corporate entity. But in advancing these arguments, Landa mischaracterizes both the record and the trial court's findings. The trial court concluded that Landa controlled both corporate entities and left Nuevagua, which inherited Endol's obligations, undercapitalized. The facts supporting these findings were robust and, as we explain, they are enough to sustain the court's use of the alter ego doctrine.

In commenting on Landa's control of the LLCs, the court noted they were organized by Landa "in a byzantine fashion, with entities as the managing members of other entities, which then became managing members of yet other entities" and that "Landa was the decision-maker for his ersatz corporations." These conclusions find support in the record, particularly Landa's own testimony. He described his practice of creating LLCs to house his business pursuits and using other preexisting LLCs or family trusts as members, effectively keeping each project separate and insulating him from personal liability. For each of his 15 to 20 LLCs, he testified that he is "usually the managing member of the managing member."

6

A more detailed review of the evidence shows the companies were organized like nesting dolls, with Landa's hand at the helm: Endol is owned by the DEFA trust, which is a family trust Landa controls as trustee. Endol also owns the idea of Diagua, which Landa never incorporated as its own LLC but nonetheless controls through his role as the manager of Endol. Nuevagua is managed by Endol and owned by four other trusts, three of which Landa controls as trustee with his children as the named beneficiaries. Landa counters that he is not enmeshed with Endol or Nuevagua since he is not the *beneficiary* of any of the family trusts that control the entities, and he does not *personally* own Endol or Nuevagua. While this is technically true, his actual, personal control of the entities through the layers of separation belies his position.

That Landa was the decision maker behind his enterprises is again demonstrated by his testimony that Carter worked as a "consultant to the project being directed by me" and that "I always direct my consultants on what to do and when." Their e-mail correspondence, submitted to the court, illustrates the same point. Although he sometimes referred to himself through layers of insulation, the substance of Landa's testimony was that he made the decisions about the water projects and controlled how they advanced. There was pronounced evidence that Landa indeed controlled the corporations. In further assessing Landa's unity of interest with the LLCs, the court found it significant that Landa "unilaterally changed the client several times mid-representation," inferring from this casual treatment of the corporate client that both men recognized Landa was ultimately responsible for Carter's fees. Given Landa's clear control of the arrangement and the apparent irrelevance of the identity of Carter's corporate client at any given time, this finding is supported.

As to undercapitalization, the court cited Nuevagua's dissolution and reliance on a loan (which was never repaid) from either Landa or a Landa-controlled entity to pay its debts. Landa testified that he did not recall Nuevagua making any money, and he provided no evidence that the LLC received capital contributions of any kind. Nevertheless, Nuevagua's balance sheet shows it incurred over one hundred thousand dollars in costs for various professional services. Apart from Carter's fees, its outstanding debts were paid with (what appear to be) no-interest loans from Landa.

Some of Landa's testimony about the funding for the LLCs seems contradictory. He said that he has never personally paid the debts of his LLCs or used funds from his family trusts to finance his business ideas, but also that his LLCs obtained loans made by different sources, such as himself or one of the trusts. He apparently uses the term "loan" liberally; at least in the case of Nuevagua, there was never repayment. Given the evidence that Nuevagua incurred substantial debts but had no capital from either member contributions or profits, the court was justified in concluding the company was undercapitalized. And although Landa insists "[t]here was no evidence presented at trial that Endol, Nuevagua, and Landa failed to abide corporate formalities, keep separate books, or otherwise commingled funds among those entities or between Landa and those entities," the evidence that Landa gave cash infusions to his debt-riddled LLCs, dipping into both the trusts he controlled and his personal funds, *is* comingling of funds and a disregard of corporate formalities. That he kept separate books and sometimes called these transfers "loans" does not change the reality that Landa's corporations incurred debts in pursuit of his business ventures and, when *he* deemed it appropriate, he paid those debts out of other funds he controlled. Alter ego, which peers beyond the labels used and "elevates substance over form," is

8

tailored precisely for cases such as this. (*Atempa v. Pedrazzani* (2018) 27 Cal.App.5th 809, 824.)

Turning to the second element required for application of the alter ego doctrine, Landa challenges the court's determination that an injustice would result from adhering to the corporation's separate status. He insists the case amounts to no more than a billing dispute with an unsatisfied debtor, conditions which alone cannot justify piercing the corporate veil. (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 539.) We agree with *Sonora* that "[t]he alter ego doctrine does not guard every unsatisfied creditor of a corporation," nor does "[d]ifficulty in enforcing a judgment or collecting a debt" amount to the injustice the doctrine contemplates. (*Ibid*.) However, only unsatisfied debtors bring these suits and courts do find occasion to pierce the corporate veil. As such, we take *Sonoro*'s reasoning to mean that an unsatisfied debt is a necessary *but not sufficient* condition to justify the use of alter ego.

Ultimately this principle does not aid Landa, who cannot show the court's decision was unsupported by the evidence. He attempts to by alleging the court could not rationally find that an injustice would flow from adherence to the corporate form and also that Carter's billing was unreasonable. He says the latter is an ostensible finding we should intuit from the court's decision to award Carter only half of his fees: "Ironically, the trial court would agree with Landa – that Carter's fees should not be paid 'as billed' – when it slashed Carter's claimed billings of $97,147.87 in half and found that only $48,573.94 of those charges could be awarded. [] In doing so, *the trial court echoed and validated Landa's concerns about the amount of Carter's billings*."

9

But even a cursory read of the trial court's statement of decision shows that Landa mischaracterizes its decision and its rationale. The court explicitly found Carter's hourly fee rate was "reasonable due to Carter's contacts in the Colorado River water bureaucracy" and that "[t]he time [he] recorded and billed . . . was reasonable for the tasks performed." It awarded Carter half of his billed fees not because it thought his rate or hours unreasonable, but because it found Landa and Carter had an agreement that Carter would defer half of his fees for some future benefit contingent on the success of the water projects. As such, the court awarded Carter *all* of the fees to which it deemed he was entitled under their agreement. This supports, rather than undermines, the court's application of the alter ego doctrine.

We find further support for the trial court's decision in *Claremont Press Pub. Co. v. Barksdale* (1960) 187 Cal.App.2d 813, which bears some significant resemblance to this case. In *Claremont*, the defendant's short-lived corporation housed his weekly newspaper venture. (*Id.* at p. 815.) The only capital invested in the company was $500, whereas it accumulated regular debt from printing services. (*Ibid.*) When the defendant sold his interest in the company, it owed over $7,000 to the printer and collapsed the following year. (*Id.* at p. 816.) The trial court held him liable for the debt to the printer, primarily due to his unity of interest with the company and the irresponsible degree of undercapitalization. (*Id.* at p. 817.) In upholding this use of alter ego, the appellate court specified these findings were enough to support the second element of the doctrine: "All that is required is a showing that it would be unjust to persist in recognition of the separate entity of the corporation [citations]. To recognize the separate entity of the corporation here would permit defendant and [his business partner] to secure for their

10

venture the benefit of plaintiff's printing services without liability therefor. This is enough to meet the test." (*Ibid.*)

The same principle applies here. To permit Landa to secure Carter's professional services for his venture without incurring any liability once he dissolved a failed business that he both controlled and undercapitalized *is enough* to support application of the alter ego doctrine if the trial court so determines. (See *Minton v. Cavaney* (1961) 56 Cal.2d 576, 580 [upholding the use of alter ego where the defendant was functionally an equitable owner of the company and made "no attempt to provide adequate capitalization"]; *Automotriz, supra*, 47 Cal.2d at p. 798 [affirming alter ego based on inadequate capitalization and the failure to issue stock].)

The trial court possesses broad discretion to decide whether an inequitable result would flow from adherence to the corporate form in the context of the case. "The issue is not so much whether the corporate entity should be disregarded for all purposes or whether its very purpose was to defraud the innocent party, as it is whether in the particular case presented, justice and equity can best be accomplished and fraud and unfairness defeated by disregarding the distinct entity of the corporate form." (*Communist Party, supra*, 35 Cal.App.4th at p. 993.)

Straying further afield, Landa perplexingly argues that Carter cannot plead alter ego against him because Carter operates his law practice as a professional corporation. He cites to *Communist Party, supra*, 35 Cal.App.4th at pp. 993–994 for the proposition that "persons who themselves control a corporation or who have used the corporate form of doing business for their benefit, may be estopped to deny a corporation's separate legal existence." Having reviewed the case, we find it clear that the court was referring to the doctrine's proper use in protecting the rights of third parties.

11

A corporation cannot raise the theory of alter ego *on its own behalf* to gain a legal advantage or eschew some duty. (*Communist Party*, at pp. 993–994.) It is not relevant that Carter uses a corporate entity to represent his business.

In a final salvo, Landa asserts it was unreasonable for the trial court to infer that both men understood Landa would be responsible for his fees. He says Carter, a sophisticated actor, should have demanded a personal guaranty from Landa if that was his expectation. What Carter could have done if he were more attentive to the pitfalls of his arrangement with Landa does not, however, change the evidence in support of the trial court's findings. At most, Landa presents another way to interpret the conflict. But our inquiry resolves when we determine, as we have here, that there was "substantial evidence, contradicted or uncontradicted, [to] support the conclusion reached by the trial judge." (*Associated Vendors*, *supra*, 210 Cal.App.2d at p. 835.)

2.    *Conflict of Interest*

Although Carter and Landa never agreed to the precise terms of Carter's fee deferment and future benefit, Landa casts Carter as so ethically compromised by the process that he should recover no fees whatsoever for his services. As Landa characterizes it, by pursuing an equity share in Nuevagua as compensation Carter created a conflict of interest that permeated the entire relationship with his client, which then incentivized him to overbill so as to later justify claiming a larger share. Landa also points out that Carter failed to abide by rule 1.8.1 (former rule 3-300) of the Rules of Professional Conduct,[1] which requires that lawyers take certain steps before entering into a business transaction with a client. He claims

---

[1]    All further rule references are to the California Rules of Professional Conduct.

these ethical transgressions are sufficiently severe as to justify a refusal to award any fee to Carter.

Landa did not raise this argument below until after the trial court issued its tentative statement of decision, and the court determined that Carter's alleged conflict of interest was not a principal controverted issue. It nonetheless indulged the discussion, saying, "[W]ere the court to address the issue of a conflict of interest, the court would find that Carter did not have a conflict precluding recovery of his fee." The court first noted that "every attorney enters into a 'business' transaction with a client when the attorney agrees to represent the client for a fee; such a transaction is clearly not intended to be covered by [rule 1.8.1]." It then explained that Carter did not actually obtain an interest in Nuevagua. Because the project was unsuccessful, any claim to equity he could have made never ripened.

Landa cites several cases for the proposition that a court may refuse to award any fee to an attorney where a conflict of interest pervades the entire attorney-client relationship. (See, e.g., *Fair v. Bakhtiari* (2011) 195 Cal.App.4th 1135, 1150 (*Fair*); *A.I. Credit Corp., Inc. v. Aguilar & Sebastinelli* (2003) 113 Cal.App.4th 1072, 1076; *Goldstein v. Lees* (1975) 46 Cal.App.3d 614, 618.) This result properly obtains " '[w]here the entire contract is prohibited by statute or public policy' " and even then is not a mandatory rule but rather a discretionary option for the trial court. (*Fair*, *supra*, 195 Cal.App.4th at p. 1150; quoting Vapnek et al., Cal. Practice Guide: Professional Responsibility (The Rutter Group 2010) ¶ 5:430.) Here, Landa can point to the purported violation of rule 1.8.1 as a reason why a contract might have been prohibited by public policy, but since that contract was never actually entered into and because Carter is not seeking to enforce such a contract, his argument sputters.

It is plain that Carter did not abide by rule 1.8.1 in the course of his *negotiations* with Landa; he did not secure a fair and reasonable agreement in writing, encourage Landa to seek the advice of independent counsel, and obtain written consent to the deal. But because the deal remained unrealized, he never obtained an interest in the company. The trial court thought as much, stating that "Carter never acquired an interest in Nuevagua." But even if he had, any benefit to which he was entitled was still contingent on the success of the project. And as the court noted, the project's failure was uncontroverted, rendering any claim to its equity pointless: "it is undisputed that the venture was *not* a success, and therefore no bonus was due," and "the issue of the interest in Nuevagua never ripened, as the venture was not successful."

Even if Landa's ethical argument survives this analysis, the trial court effectively disposed of the issue by awarding Carter half of his fees—the portion that was never affected by his potential equity share in Nuevagua. As the court understood their implied agreement, the men agreed that half of Carter's fees would be paid regardless of the fate of the project. And by awarding him half *and no more*, the court cleared away any aspect of Carter's claim that could be tied to his purported interest in Nuevagua and thus affected by the ethical concerns raised.

Landa insists the trial court did not appreciate the interplay between Carter's undefined equity interest in Nuevagua and his incentive to overbill. But the court understood, as do we, that this is merely a prosaic problem. Landa has succeeded in describing the inherent tension present in any attorney-client relationship. Strictly speaking, lawyers billing on a time basis always have an incentive to work unnecessary hours or inflate their time spent in order to be paid more, which of course runs contrary to the

14

client's interest in obtaining legal services at a reasonable cost. This dynamic does not necessarily change when an attorney's compensation takes an atypical form. Here, the trial court properly concluded that this inherent conflict did not prevent Carter from recovering the *portion of his fee*, calculated on a standard hourly basis, which it deemed the parties had agreed to even absent the success of the water project.

Finally, we note that even if Carter possessed a mature and obvious conflict of interest, it does not follow that he would necessarily be barred from recovering fees. The Supreme Court recently clarified this point; it is within the trial court's discretion to weigh specific factors, including "the egregiousness of the attorney's conduct, its potential and actual effect on the client and the attorney-client relationship, and the existence of alternative remedies [to determine] whether and to what extent forfeiture of compensation is warranted." (*Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Co., Inc.* (2018) 6 Cal.5th 59, 89.) If Landa had both raised this argument earlier and demonstrated that Carter had a ripe conflict of interest, it would have been for the trial court to determine whether all the relevant factors justified a forfeiture of Carter's entire fee.

## DISPOSITION

The judgment is affirmed.  Respondent is entitled to costs on appeal.


DATO, J.

WE CONCUR:


BENKE, Acting P. J.


AARON, J.